# In the United States Court of Federal Claims

No. 12-785C

(E-Filed:  November 21, 2013)[1]

_____

|  |  |  |
|---|---|---|
| RICHARD P. WATSON, | ) | |
| | ) | Motion to Dismiss for Lack of |
| Plaintiff, | ) | Jurisdiction; RCFC 12(b)(1); |
| | ) | Waiver; Motion for Judgment on |
| v. | ) | the Administrative Record; RCFC |
| | ) | 52.1; 37 U.S.C. § 204; 10 U.S.C. § |
| THE UNITED STATES OF AMERICA, | ) | 1201; RCFC 52.2 |
| | ) | |
| Defendant. | ) | |

_____

Raymond J. Toney, Emeryville, CA, for plaintiff.

J. Hunter Bennett, Trial Attorney, with whom were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## ORDER and OPINION

CAMPBELL-SMITH, Chief Judge

      Richard P. Watson (plaintiff or Mr. Watson), a veteran with approximately four years of service in the United States Army (Army), brings claims against the United States (defendant) under the Military Pay Act, 37 U.S.C. § 204, and 10 U.S.C. § 1201, which governs disability retirement pay.  See Compl. (Complaint or Compl.), Docket Number (Dkt. No.) 1, ¶¶ 1, 3, 10-11; cf. 37 U.S.C. § 204(a) (2006); 10 U.S.C. § 1201 (2006).  Mr. Watson enlisted in the Army on September 9, 2004 and served until July 11,

---

[1] This Opinion was originally filed under seal on November 8, 2013.  See Opinion of Nov. 8, 2013, Dkt. No. 28.  The court requested the parties to file a motion by Friday, November 15, 2013, if either party believed that the Opinion should be redacted before publication.  See id. at 1 n.1.  Having not received a motion by either party, the Opinion is published in its entirety. Cf. Order of Nov. 18, 2013, Dkt. No. 29 (reminding the parties of the court's request and further advising that if no such motion is filed by Wednesday, November 20, 2013, the Opinion would be published in its entirety).

2008.  Compl. ¶¶ 10-11.  During his service, Mr. Watson served two tours of duty in Iraq: from May through September 2005 and from August through December 2007.  Id. ¶ 13.  The Army ordered Mr. Watson to return to Iraq for a third tour of duty on December 23, 2007, id. ¶ 45, but Mr. Watson refused to deploy, id. ¶ 47.  As a result, the Army charged and convicted Mr. Watson under the Uniform Code of Military Justice (UCMJ) for missing movement to Iraq, id. ¶¶ 52, 55, and involuntarily discharged him under other than honorable conditions, id. ¶ 55.

Plaintiff claims that the Army's August 2007 deployment of Mr. Watson to Iraq and its December 2007 order to redeploy were unlawful because Mr. Watson was not medically fit for deployment.  Specifically, plaintiff alleges that, in October 2006, Mr. Watson was diagnosed with optic nerve atrophy and optic neuritis, conditions that obligated the Army to refer him to a Medical Evaluation Board (MEB) pursuant to the Army Physical Disability Evaluation System (Disability Evaluation System).  See id. ¶¶ 70-72, 79; cf. infra Part I.A (discussing the Disability Evaluation System).  Notwithstanding its alleged obligation to do so, the Army did not refer Mr. Watson to an MEB.  Compl. ¶¶ 79-80.  According to plaintiff, Mr. Watson's August 2007 deployment to Iraq was therefore unlawful,[2] id. ¶ 80, as was the Army's December 2007 order that Mr. Watson redeploy to Iraq, see id. ¶¶ 85, 88.  Plaintiff further contends that, because the Army's redeployment order was unlawful, Mr. Watson's refusal to deploy was justified, see id. ¶¶ 89-90, and his subsequent involuntary discharge for misconduct was also unlawful, see id. ¶¶ 55, 90.

In March 2012, Mr. Watson applied to the Army Board for Correction of Military Records (the Board or the ABCMR) for correction of his military records.[3]  Id. ¶ 7.  Mr. Watson requested much of the same relief from the Board that he seeks from this court: that his involuntary discharge be voided; that he be reinstated to active duty, effective July 12, 2008, with back pay and allowances; that his grade be restored; and that he be

---

[2]  Richard P. Watson (plaintiff or Mr. Watson) provides inconsistent dates with respect to his 2007 deployment to Iraq.  Compare Compl., Dkt. No. 1, ¶ 13 (stating that Mr. Watson was deployed to Iraq in August 2007) with id. ¶ 80 (indicating that Mr. Watson was deployed to Iraq in September 2007).  The Administrative Record (AR) suggests that Mr. Watson deployed to Iraq in August 2007.  AR 13 (Army Board for Correction of Military Records (the Board or the ABCMR) Record of Proceedings (ABCMR record)).  The court does not consider the exact date of Mr. Watson's 2007 deployment to Iraq to be material to the court's resolution of the case.

[3]  The ABCMR is authorized to "direct[] or recommend[] correction of military records to remove an error or injustice."  Army Reg. 15-185 ¶ 2-2.a.  "The ABCMR operates pursuant to law (10 USC 1552) within the Office of the Secretary of the Army."  Id. ¶ 2-1; see 10 U.S.C. § 1552 (2006) ("The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice.").

referred to an MEB for disability evaluation processing.[4]  Compare id. ¶ 61 (listing the relief requested from the Board) with id. ¶ 92 (listing the relief requested in this court). On October 18, 2012 the Board denied the relief requested by Mr. Watson.  See id. ¶ 62; cf. supra note 4 (noting that the Board granted Mr. Watson's request that he be awarded a Purple Heart).  On November 16, 2012, plaintiff filed a complaint in this court.  See generally Compl.  Plaintiff seeks review of the Board's findings, which, according to plaintiff, are "arbitrary, capricious, unsupported by substantial evidence and contrary to law."  See id. ¶¶ 75, 81, 91.

Currently before the court, in addition to the Complaint, are:  Defendant's Motion to Dismiss or, Alternatively, for Judgment upon the Administrative Record (defendant's Motion or Def.'s Mot.), Dkt. No. 15, and defendant's Appendix (Def.'s App.), Dkt. No. 15-1, both filed March 21, 2013; Plaintiff's Memorandum in Support of His Cross-Motion for Judgment on the Administrative Record and in Opposition to Defendant's Motion to Dismiss or for Judgment on the Administrative Record (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 16, filed April 22, 2013; Defendant's Opposition to Plaintiff's Cross-Motion for  Judgment on the Administrative Record and Reply in Support of Motion to Dismiss or, Alternatively, for Judgment on the Administrative Record (defendant's Response or Def.'s Resp.), Dkt. No. 17, filed May 23, 2013; and Plaintiff's Response to Defendant's Opposition to His Cross-Motion for Judgment on the Administrative Record and Reply in Support Thereof (plaintiff's Response or Pl.'s Resp.), Dkt. No. 18, filed June 10, 2013.  The Administrative Record (AR) was filed by defendant on March 21, 2013.  See generally Dkt. (noting filing).  And, in response to the court's Order of September 25, 2013, see Order of Sept. 25, 2013, Dkt. No. 22, the parties also filed supplemental briefing on October 2, 2013, see Def.'s Suppl. Br., Dkt. No. 23; Pl.'s Suppl. Mem. Filed in Accordance with the Order of the Ct. Dated Sept. 25, 2013 (Pl.'s Suppl. Br.), Dkt. No. 24.

Defendant moves to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) or, in the alternative, for judgment upon the administrative record pursuant to Rule 52.1.  Def.'s Mot. 1; see RCFC 12(b)(1); RFCF 52.1.  With respect to defendant's motion to dismiss for lack of jurisdiction, defendant contends that "[t]he crux of Mr. Watson's complaint is that the court-martial conviction that led to his discharge should be voided," and that this court lacks jurisdiction to hear Mr. Watson's "collateral attack upon his court-martial conviction."  Def.'s Mot. 14.  Defendant further argues that, even if this court had jurisdiction over the Complaint, Mr. Watson has waived his right to judicial review of both his court-martial conviction, id. at 18-19, and his involuntary discharge, id. at 15. With respect to defendant's motion for judgment on the administrative record, defendant

_____

[4]  Mr. Watson also requested that the Board award him a Purple Heart as a result of an injury he sustained from an improvised explosive device blast in Iraq in September 2007.  See Compl. ¶¶ 35, 61.  The Board granted this relief and recommended that the Army correct Mr. Watson's records and award him the Purple Heart.  AR 22 (ABCMR record).

argues that, because "Mr. Watson was not conclusively diagnosed with any medical issue or disorder that required referral to a MEB . . . during his active duty service," the Board reasonably and lawfully concluded that the Army was not required to refer Mr. Watson to an MEB, and that, as a result, the Army's deployment of Mr. Watson to Iraq and subsequent order to redeploy Mr. Watson were lawful. Id. at 24 (capitalization and emphasis omitted).

Plaintiff responds to defendant's motion to dismiss by claiming that Mr. Watson's court-martial conviction "is practically immaterial to his claims" and that plaintiff does not, in fact, seek review of this conviction. Pl.'s Mot. 23. Plaintiff further argues that he has not waived the right to challenge his involuntary discharge. See id. at 17. Plaintiff also cross-moves for judgment on the administrative record, arguing that the findings by the Board that Mr. Watson did not suffer from a disqualifying condition and that Mr. Watson was medically fit for deployment were "arbitrary, capricious, unsupported by substantial evidence, and contrary to law." See id. at 25, 33 (capitalization and emphasis omitted).

For the following reasons, plaintiff's Motion is GRANTED-IN-PART and DENIED-IN-PART, and defendant's Motion is DENIED.

I.     Background[5]

A.     The Army's Physical Disability Evaluation System

The Army's process for determining whether a soldier should be discharged by reason of medical disability is known as the Disability Evaluation System.[6] The Disability Evaluation System is three-tiered, consisting of: (1) an MEB to determine whether a soldier meets medical retention standards, see Army Reg. 635-40 ¶ 4-10; (2) an informal and then--if the soldier does not waive the right to one--a formal Physical Evaluation Board (PEB) to determine whether a soldier who does not meet medical retention standards is fit for duty and, in the event that the soldier is found not fit for duty, to determine the soldier's disability rating, see id. ¶¶ 4-13, 4-17, 4-19; and, in certain

_____

[5] The facts are taken from the Complaint and the Administrative Record. Except as otherwise noted, the facts do not appear to be in dispute.

[6] The Army Physical Disability Evaluation System (Disability Evaluation System) is established by Army Regulation (Army Reg.) 635-40, which is included in defendant's Appendix (Def.'s App.), Dkt. No. 15-1, see Army Reg. 635-40 ¶ 1-1 (stating that the Disability Evaluation System is established pursuant to chapter 61 of title 10 of the United States Code-- that is, 10 U.S.C. §§ 1201-22 (2006)--and pursuant to Department of Defense Directive 1332.18). Army Regulation 635-40 "sets forth policies, responsibilities, and procedures that apply in determining whether a Soldier is unfit because of physical disability to reasonably perform the duties of his or her office, grade, rank, or rating." Army Reg. 635-40 ¶ 1-1.

situations, (3) additional review by the U.S. Army Physical Disability Agency, see id. ¶ 4-22.

At the MEB level, tier one, a soldier's medical status and duty limitations are documented.  Id. ¶ 4-10.  The decision as to whether the soldier meets medical retention standards is made based on the criteria in chapter 3 of Army Regulation 40-501.[7]  Id.  "If the MEB[] determines the Soldier does not meet retention standards, the board will recommend referral of the Soldier to a PEB."  Id.; see Army Reg. 40-501 ¶ 5-14(c) ("Active duty soldiers who do not meet the medical retention standards in chapter 3 of this regulation must be referred to an MEB/PEB for a fitness-for-duty determination.").

As is relevant here, certain eye and neurological conditions are causes for referral to an MEB.  Eye conditions that are causes for referral to an MEB include "[a]trophy of the optic nerve due to disease."  Army Reg. 40-501 ¶ 3-15(c).  Neurological conditions that are causes for referral to an MEB include "[m]ultiple sclerosis, optic neuritis, transverse myelitis, and similar demyelinating disorders."  Id. ¶ 3-30(e).

B.      A Summary of Mr. Watson's Medical History While on Active Duty

On September 6, 2006--while stationed in Vilseck, Germany, AR 12 (ABCMR record)--Mr. Watson was admitted to a hospital in Amberg, Germany (the Amberg hospital) for complaints of "visual disturbances" and numbness in his left arm and left side of his face, AR 37 (Sept. 15, 2006 medical rpt.); cf. Compl. ¶ 17 (claiming that the Veterans Administration (VA) has since confirmed that these symptoms were "the first manifestation of Multiple Sclerosis ('MS'), from which Mr. Watson continues to suffer").  In a report dated September 15, 2006, a doctor from the neurology division of the Amberg hospital, Dr. Wolfgang Boessenecker (Dr. Boessenecker), noted that Mr. Watson had "fairly typical clinical symptoms of an early chronic inflammatory [central nervous system] disease (encephalomyelitis disseminata)" but that other evidence suggested that Mr. Watson may have "retrobulbar neuritis (opticusneuritis) of the left eye."  AR 37-39 (Sept. 15, 2006 medical rpt.); cf. AR 54 (Oct. 31, 2006 letter) (suggesting that Dr. Boessenecker works for the Neurology Clinic of the Amberg hospital).  Dr. Boessenecker

---

[7]  A copy of the version of Army Regulation 40-501 in effect at the time of Mr. Watson's release from active duty is included in defendant's Appendix.  See Def.'s App. A1-A32 (Army Reg. 40-501) (effective Dec. 14, 2007).  However, the court understands that the events that give rise to plaintiff's claims occurred in October 2006.  Cf. Compl. ¶¶ 70-72 (claiming that Mr. Watson was diagnosed with optic nerve atrophy and optic neuritis in October 2006 and that these diagnoses triggered the Army's obligation to refer Mr. Watson to a Medical Evaluation Board (MEB)).  Accordingly, the court cites to the version of Army Regulation 40-501 in effect in October 2006 and all references are to that version of the regulation.  Cf. Army Reg. 40-501 (effective Feb. 1, 2005).  The court notes that, except for differences in capitalization of certain words, the provisions cited to and referenced in this Opinion are identical in both versions of the regulation.

also noted that a magnetic resonance imaging (MRI) test revealed lesions in Mr. Watson's central nervous system, which could not "be certainly identified," but that the MRI--"in correlation to the clinical data and the patient's age in connection with other available appropriate criteria"--supported a diagnosis of "an early inflammatory change." AR 38 (Sept. 15, 2006 medical rpt.).  Mr. Watson was discharged from the Amberg hospital on September 13, 2006, with the recommendation that he receive a follow-up MRI in three months. Id. at 39.

On October 13, 2006, Mr. Watson visited an optometry clinic in an Army medical treatment facility in Vilseck, Germany (the Vilseck optometry clinic), complaining of decreased vision.  See AR 40 (Oct. 13, 2006 Chronological Record of Medical Care (CRMC)).  Several diagnostic tests were performed but no abnormalities were noted.  See id. at 40-41.  Dr. Jinjong Chung (Dr. Chung), the chief of optometry at the Vilseck optometry clinic, diagnosed Mr. Watson with "optic atrophy:  possibly due to stroke" and released Mr. Watson without limitations.  Id. at 41 (capitalization omitted); cf. AR 43 (Oct. 16, 2006 CRMC) (identifying Dr. Chung as the chief of optometry).  Mr. Watson made return visits to the Vilseck optometry clinic on October 16, October 18 and November 22, 2006.  See AR 42 (Oct. 16, 2006 CRMC); AR 46 (Oct. 18, 2006 CRMC); AR 60 (Nov. 22, 2006 CRMC).  On each occasion, Dr. Chung diagnosed Mr. Watson with "optic atrophy" and released him without limitations.  See AR 43 (Oct. 16, 2006 CRMC) (capitalization omitted); AR 60 (Nov. 22, 2006 CRMC) (capitalization omitted); see AR 47 (Oct. 18, 2006 CRMC) (listing "optic atrophy" as Mr. Watson's "primary diagnosis" (capitalization omitted)).

On October 17, 2006, Mr. Watson visited an Army aid station for a medical evaluation and treatment.  See AR 50 (Oct. 25, 2006 medical note); cf. Compl. ¶¶ 23-24 (suggesting that the visit occurred on October 17, 2006).  Captain James L. Duncan (Captain Duncan), a physician's assistant, Compl. ¶ 24, observed that, while Mr. Watson was a patient at the Amberg hospital, he was diagnosed with "left atrophic optic nerve" and that this diagnosis was confirmed by Dr. Chung, AR 50 (Oct. 25, 2006 medical note).  Approximately one hour after Mr. Watson arrived at the aid station, Mr. Watson was transferred by ambulance to the Amberg hospital.  See AR 50, 52 (Oct. 25, 2006 medical note); Compl. ¶ 23.

Upon arriving at the Amberg hospital, Mr. Watson complained of "vision disturbances" in his left eye and "tingling" in his left arm and on the left side of his face. AR 44 (Oct. 17, 2006 letter).  Mr. Watson reported that his vision had not improved since he was discharged from the hospital on September 13, 2006. Id.  In a letter dated October 17, 2006, Dr. Boessenecker stated that he had "no new diagnostic ideas" and that "the best explanation for the patient['s] symptoms is an optic nerve neuritis." Id.  Dr. Boessenecker further noted that "[t]his optic nerve neuritis could be the beginning of a chronic . . . inflammatory central nervous system disease but there are no further proofs for this diagnosis (for example encephalomyelitis disseminata)." Id.  Dr. Boessenecker

recommended that Mr. Watson receive a follow-up MRI in six to eight weeks and that Mr. Watson "not go to his work for about two or three weeks."  Id.

On October 23, 2006, Mr. Watson visited an ophthalmology clinic at an Army medical treatment facility in Landstuhl, Germany (the Landstuhl ophthalmology clinic), complaining of decreased vision in his left eye.  See AR 48 (Oct. 23, 2006 CRMC); cf. id. at 49 (stating that Dr. Chung was the referring physician).  Mr. Watson reported that his symptoms "[s]tarted with paresthesias in [his] left hand and face and then [Mr. Watson] noted [a] marked decrease in vision [in his left eye]."  Id. at 48.  Mr. Watson also reported that he had been seen by a neurologist, who "noted optic nerve swelling [in his left eye]," and that an MRI had revealed "non-specific lesions."  Id.  The examining physician, Dr. Todd Hess (Dr. Hess), identified "optic atrophy" as Mr. Watson's "provisional diagnosis" and recommended that Mr. Watson schedule a follow-up appointment.  See id. at 49 (capitalization omitted).

On October 30, 2006, Mr. Watson was seen by another doctor in the neurology division of the Amberg hospital, Dr. Schmidt.  AR 53 (Oct. 30, 2006 letter).  In a letter dated October 30, 2006, Dr. Schmidt diagnosed Mr. Watson with "[l]ight[] hemiparalysis left, sensory distortion of the left arm" and "[o]pticusneuritis left eye."  Id.  After reviewing Mr. Watson's history of treatment, Dr. Schmidt stated that, despite several examinations, he could not identify any "cogent reason for the patient['s] symptoms."  Id. Dr. Schmidt recommended that Mr. Watson not return to work for thirty days.  Id.

The following day, Mr. Watson returned to the Amberg hospital with complaints of increased "sensitivity disturbance of his left half of the face and the left upper extremities."  AR 54 (Oct. 31, 2006 letter).  In a letter dated October 31, 2006, Dr. Boessenecker noted that Mr. Watson had been admitted to the Amberg hospital with almost identical symptoms in September and that he was ultimately "released with no final diagnosis," see id. at 55; cf. AR 37, 39 (Sept. 15, 2006 medical rpt.) (stating that Mr. Watson was admitted on September 6 and released on September 13, 2006).  Dr. Boessenecker stated that Mr. Watson's "renewed . . . symptoms again gave no direction," AR 55 (ABCMR record), but that "various neurological diseases" could be excluded as possible diagnoses, id. at 54.  However, Dr. Boessenecker stated that there was a "continued suspicion" that the correct diagnosis was "chronic inflammatory disease of the central nervous system (encephalomyelitis disseminata)," id.; see also id. at 55 ("At the present time we assume more likely a difficult-to-diagnose chronic inflammatory central nervous system disease . . . ."), and that "retrobulbar neuritis was . . . a probable diagnosis," id. at 55.

On October 31, 2006, the Army assigned Mr. Watson to a temporary physical profile of three for a medical condition described as "possible mini-stroke, paralysis of

left face and loss of left vision."[8]  AR 65 (Oct. 31, 2006 physical profile); see AR 13 (ABCMR record) (noting that Mr. Watson was assigned a temporary physical profile of three).  Mr. Watson was directed not to "run, jump, roadmarch, carry greater th[a]n 10 pounds," or work more than eight hours a day.  Id.  The temporary physical profile was set to expire on January 31, 2007, id., but it was ultimately extended until April 30, 2007, AR 66 (Jan. 31, 2007 Physical Profile).

On February 2, 2007, Mr. Watson was transported by ambulance to the Amberg hospital.  AR 224 (Feb. 5, 2007 letter).  Dr. Boessenecker noted that Mr. Watson's vision disturbances had not improved since his October visit and again diagnosed Mr. Watson with "[o]ptic nerve neuritis on the left side with severe vision disturbance."  Id; cf. AR 44 (Oct. 17, 2006 letter) (listing a similar diagnosis).  Mr. Watson received an MRI during his visit, and Dr. Boessenecker recommended a follow-up MRI in three months as well as an ophthalmologic examination.  AR 224 (Feb. 5, 2007 letter).

On May 30, 2008, following his court martial conviction for missing movement to Iraq, see infra Part I.D, plaintiff received a mental status evaluation at an Army mental health clinic, AR 1192 (May 30, 2008 mental status rpt.).  According to a record of the visit, the attending clinical psychologist found no evidence of psychiatric, mental or emotional conditions and observed that Mr. Watson was "mentally responsible for his behavior, [could] distinguish right from wrong, and possesse[d] sufficient mental capacity to understand and participate in any administrative or judicial proceedings."  Id.

C.     Mr. Watson's Deployment to Iraq

Mr. Watson deployed to Iraq on August 8, 2007.  AR 13 (ABCMR record).  On October 10, 2007, he was found unconscious at his base in Iraq, and his rifle was found approximately twenty feet away.  See id. at 14.  Mr. Watson was subsequently taken to an aid station for a medical evaluation.  Compl. ¶ 40.  On November 1, 2007, he received nonjudicial punishment under the UCMJ "for wrongfully disposing of his weapon through neglect by leaving it laying on the ground, unsecured and unattended, on 10

---

[8]  The Army's physical profile system is "a system for classifying individuals according to functional abilities."  Army Reg. 40-501 ¶ 7-1.  In an effort to "provide an index to overall functional capacity," individuals are assigned one of four physical profile numerical designations.  Id. ¶ 7-3(b).  For example, an individual assigned a physical profile of three "signifies that the individual has one or more medical conditions or physical defects that may require significant limitations," and that "[t]he individual should receive assignments commensurate with his or her physical capability for military duty."  Id. ¶ 7-3(d)(3).

Individuals are also assigned either temporary or permanent physical profiles.  See id. ¶ 7-4.  Relevant here, "A temporary profile is given if the condition is considered temporary, the correction or treatment of the condition is medically advisable, and correction usually will result in a higher physical capacity."  Id.  ¶ 7-4(b).

October 2007." AR 14 (ABCMR record); cf. infra note 9 (discussing nonjudicial punishment under the UCMJ). The punishment imposed was fourteen days of restriction and extra duty. Id.

On December 2, 2007 Mr. Watson traveled to the United States on authorized leave. See AR 14 (ABCMR record). On December 20, 2007, he returned to Vilseck, Germany, where he was informed that he would be redeployed to Iraq on December 23, 2007. See id.

D.    Events Surrounding Mr. Watson's Court-Martial Proceedings and Involuntary Discharge Under Other than Honorable Conditions

Mr. Watson refused to deploy to Iraq on December 23, 2007. See id. Three days later, he visited a primary care clinic in Vilseck to be evaluated for deployment. AR 62 (Dec. 26, 2007 CRMC). Mr. Watson informed the examining physician, Dr. Elizabeth Hersch (Dr. Hersch) that he was "going through a divorce and suffering from severe depression," id., and that he did not "want to be sent back to Iraq," id. at 64. Mr. Watson also reported that, following a September 2007 injury he suffered from an improvised explosive device, see Compl. ¶ 35, mental health officers in Iraq recommended that "he return from deployment" and that he not be redeployed until he received an evaluation, see AR 62 (Dec. 26, 2007 CRMC). Dr. Hersch diagnosed Mr. Watson with an "adjustment disorder with mixed emotional features" and advised that Mr. Watson receive a final assessment before being redeployed to Iraq. See id. at 63 (capitalization and emphasis omitted).

On January 31, 2008 the Army brought court-martial charges against Mr. Watson for "missing movement by design." AR 15 (ABCMR record); cf. Manual for Courts-Martial (2008 ed.), pt. IV, art. 87, ¶ 11.a (providing that if an officer, "through neglect or design[,] misses the movement of a ship, aircraft or unit with which he is required in the course of duty to move shall be punished as a court-martial may direct"). On the advice of his counsel, Mr. Watson pled guilty to the charges, Compl. ¶ 53, and, on May 2, 2008, he was "convicted by a summary court-martial[9] of one specification of missing

---

[9]  The Uniform Code of Military Justice sets forth four methods for disciplining service members involved in offenses: general, special, and summary courts-martial and nonjudicial punishment. See Dumas v. United States, 223 Ct. Cl. 465, 620 F.2d 247, 251 (1980). "The general and special courts-martial are essentially full judicial proceedings, presided over by lawyer judges with counsel for both the prosecution and defense," whereas the summary courts-martial are presided over by a commissioned officer. Id. "[N]onjudicial punishment . . . is the least formalized method of discipline, conducted personally by the accused's commanding officer." Id.

"The range of punishments available under a proceeding becomes . . . comparatively milder as procedures become less formally judicial in nature." Id. Pertinent to this case, the

movement by design," AR 15 (ABCMR record) (footnote added).[10]  Mr. Watson was
sentenced to imprisonment for twenty-eight days and his grade was reduced from E-4 to
E-1.  See id.

    On June 12, 2008, Mr. Watson's immediate commander provided a memorandum
(the separation action memorandum) to Mr. Watson advising that he planned to initiate a
separation action against Mr. Watson "for the Commission of a Serious Offense."  AR
137 (separation action mem.); see AR 16 (ABCMR record).  The reasons behind the
commander's proposed separation action included missing movement by design,
wrongful disposal of a military weapon and disobeying orders on several occasions.[11]

---

"maximum penalty which can be adjudged in a summary court-martial is confinement for 30
days, forfeiture of two-thirds pay per month for one month, and reduction to the lowest pay
grade."  Manual for Courts-Martial, Pt. II, ch. XIII, Rule 1301 of the Rules for Courts-Martial.

   [10]  Plaintiff states in his Motion that, on April 14, 2008, Mr. Watson signed two
documents related to his court-martial proceedings:  (1) "an 'Offer to Plead Guilty at Summary
Court-Martial[,]' which . . . contained a provision waiving his right to an administrative
separation board," and (2) "a 'Waiver of Administration Separation.'"  Pl.'s Mem. in Support of
His Cross-Mot. for J. on the Admin. R. & in Opp'n to Def.'s Mot. to Dismiss or for J. on the
Admin. R. (Pl.'s Mot.), Dkt. No. 16, at 9-10.  As support for these statements, plaintiff cites to
Defendant's Appendix, which includes the two documents.  Pl.'s Mot. 9-10 (citing Def.'s App.
A70-74).  Plaintiff notes, however, that the two documents are not in the administrative record.
Id. at 10 n.1.

   On August 5, 2013, the court ordered that the parties "further brief the court as to whether
it should supplement the Administrative Record with the two documents in defendant's
Appendix."  Order of Aug. 5, 2013, Dkt. No. 19, at 1 (citing Albino v. United States, 93 Fed. Cl.
405, 408 (2010) (stating that "[t]he parties' ability to supplement the administrative record is
limited," and that the United States Court of Appeals for the Federal Circuit has advised that
"supplementation of the administrative record is appropriate 'only if the existing record is
insufficient to permit meaningful review consistent with the [Administrative Procedure Act].'"
(quoting Axiom Res. Mgmt., Inc. v. United States (Axiom), 564 F.3d 1364, 1381 (Fed. Cir.
2009)))).

   Defendant filed a notice on August 9, 2013, in which defendant explained that the two
"documents provide context to Mr. Watson's decision not to challenge his separation from the
Army."  Notice, Dkt. No. 20, at 1; cf. infra Part III.B.1 (discussing defendant's waiver
argument).  However, defendant stated that, because "this Court can conduct 'meaningful
review' of plaintiff's claims without considering [the two documents]," it was "withdraw[ing] its
request that this Court supplement the administrative record with the two documents."  Id.
(quoting Axiom, 564 F.3d at 1381).  Accordingly, the court will not rely on the two documents
in defendant's Appendix to aid in its resolution of the case.

   [11]  The circumstances surrounding the "several occasions" on which Mr. Watson
disobeyed orders are not described in detail in the record.  Cf. AR 137 (separation action mem.)

See AR 137 (separation action mem.); cf. supra Part I.C (discussing the events surrounding Mr. Watson's wrongful disposal of weapon charge). The commander advised Mr. Watson that he was recommending that Mr. Watson be discharged under other than honorable conditions and that Mr. Watson had the right to consult with counsel and the right to have an administrative board consider his case. See AR 137 (separation action mem.). He also informed Mr. Watson that he could "request a hearing before an administrative board, or . . . present written statements instead of requesting board proceedings"; that he had "the right to consult with consulting counsel and/or civilian counsel at no expense to the Government"; that he could "request appointment of military counsel for representation"; and that he could "retain civilian counsel at no expense to the Government." Id.

That same day, Mr. Watson received a second memorandum (the rights advisement memorandum), which provided Mr. Watson the opportunity to request or waive various rights. See AR 135-36 (rights advisement mem.). Mr. Watson acknowledged that he had been advised of the basis behind the proposed separation action, its effects and the rights that were available to him. Id. at 135. Mr. Watson also initialed next to the statements: "I . . . waive[] consideration of my case by an administrative separation board" and "I . . . waive[] personal appearance before an administrative separation board." Id. Mr. Watson further declined to submit statements on his own behalf and initialed next to the following statements: "I . . . waive[] consulting counsel and representation by military counsel" and "Before completing this format, I have been afforded the opportunity to consult with appointed counsel of my own choice, if he/she is reasonably available; or civilian counsel at my own expense. I . . . decline[] the opportunity." Id.

The separation authority approved Mr. Watson's discharge under other than honorable conditions on July 3, 2008, and Mr. Watson was discharged on July 11, 2008. AR 16 (ABCMR record).

E.    Procedural History

---

(stating that one of the reasons for initiating a separation action against Mr. Watson was because he "disobeyed a noncommissioned officer and a commissioned officer on several occasions"). It appears that, in October of 2007, Mr. Watson was counseled for insubordinate conduct for being disrespectful to his First Sergeant, see AR 14 (ABCMR record), and that, in March of 2008, he was ordered to have no contact with his family for 72 hours after military police removed him from his home, id. at 15. Following both incidents, Mr. Watson was a "advised that continued conduct of [such] nature could result in him being recommended for administrative action such as . . . separation from active duty." Id. at 14-15. It is not clear to the court whether these incidents constitute two of the "several occasions" on which Mr. Watson disobeyed orders. Cf. AR 137 (separation action mem.)

On October 9, 2008, Mr. Watson applied for and received from the VA a determination that his military service was honorable for purposes of veterans benefits and medical care. See AR 95 (Oct. 9, 2008 VA decision); cf. id. (finding that Mr. Watson was suffering from depression and was diagnosed with an adjustment disorder and that these conditions "present[ed] reasonable justification for [Mr. Watson's] actions"). In December of 2009, the VA found that Mr. Watson had several service-connected conditions owing to multiple sclerosis and assigned each condition a disability rating ranging from 0% to 20%. AR 203-04 (Dec. 11, 2009 VA Rating Decision); cf. AR 121 (Decl. of Mr. Watson) (stating that he is "currently rated as 100% disabled by the VA").

On March 2, 2012, plaintiff applied to the Board for correction of his military records. AR 23 (Appl. for Correction of Military R.). Mr. Watson requested much of the same relief from the Board that he seeks from this court. Compare Compl. ¶ 61 (listing the relief requested before the Board) with id. ¶ 92 (listing the relief requested before this court). On October 18, 2012 the Board denied the relief requested by Mr. Watson, see AR 21 (ABCMR record); cf. supra note 4 (noting that the Board granted Mr. Watson's request that he be awarded a Purple Heart), finding that Mr. Watson "was never diagnosed with any medical issue/disorder that required referral to an MEB/PEB during his active duty service," and that, therefore, Mr. Watson never had any "medical issues that prevented his redeployment," AR 19-20 (ABCMR record).

Mr. Watson filed a complaint in this court on November 16, 2012. See generally Compl. In his complaint, plaintiff argues that certain findings by the Board are "arbitrary, capricious, unsupported by substantial evidence and contrary to law," namely, that the Army was not obligated to refer Mr. Watson to an MEB, see id. ¶ 75, and that the Army's August 2007 deployment of Mr. Watson to Iraq and December 2007 order to redeploy were lawful, see id. ¶¶ 80-81, 85, 91.

II.    Legal Standards

A.    Jurisdiction

A court must determine at the outset of a case whether it has subject matter jurisdiction over the claims before it. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998); PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1365 (Fed. Cir. 2007). If the court determines that it does not have jurisdiction over a claim, the claim must be dismissed. See RCFC 12(h)(3). The burden is on the plaintiff to show jurisdiction by a preponderance of the evidence. Taylor v. United States, 303 F.3d 1357, 1359 (Fed. Cir. 2002).

The United States Court of Federal Claims (Court of Federal Claims) is a court of limited jurisdiction that, pursuant to the Tucker Act, may hear "any claim against the

United States founded . . . upon . . . any Act of Congress or any regulation of an executive department." 28 U.S.C. § 1491(a) (2006).  The Tucker Act serves as a waiver of sovereign immunity and a jurisdictional grant, but it does not create a substantive cause of action.  Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).  A plaintiff must, therefore, satisfy the court that "'a separate source of substantive law . . . creates the right to money damages.'"  Id. (quoting Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part)).

The court's six-year statute of limitations, a condition on the Tucker Act's waiver of sovereign immunity, further limits the court's jurisdiction.  See Martinez v. United States, 333 F.3d 1295, 1316 (Fed. Cir. 2003) (en banc) ("It is well established that statutes of limitations for causes of action against the United States, being conditions on the waiver of sovereign immunity, are jurisdictional in nature.").  The statute of limitations provides that claims over which the Court of Federal Claims would otherwise have jurisdiction "shall be barred unless the petition thereon is filed within six years after such claim first accrues."  28 U.S.C. § 2501.

Although equitable remedies are generally outside this court's jurisdiction, equitable relief "as an incident of and collateral to" judgment for money damages is available "[t]o provide an entire remedy and to complete the relief afforded by the judgment."  28 U.S.C. § 1491(a)(2).  "[A]s an incident of and collateral to" a money judgment, this court may "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records." Id.; see Haskins v. United States, 51 Fed. Cl. 818, 822 (2002).

B.      Judgment on the Administrative Record

Rule 52.1(c) of the RCFC provides for motions for judgment on the administrative record.  See RCFC 52.1(c)(1) (providing that "a party may move for partial or other judgment on the administrative record").  A motion for judgment on the administrative record is "distinguish[able]" from a motion for summary judgment in that there is no requirement that all material facts be undisputed.  Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005); see also RCFC 52.1 rules committee note (2006) ("Summary judgment standards are not pertinent to judicial review upon an administrative record.").  "The standards and criteria governing the court's review of agency decisions [on a Rule 52.1(c) motion] vary depending upon the specific law to be applied in particular cases."  RCFC 52.1 rules committee note (2006).  "[J]udicial review of decisions of military correction boards is conducted under the [Administrative Procedure Act (APA)]" standard of review, Walls v. United States, 582 F.3d 1358, 1367 (Fed. Cir. 2009), that is, whether the decision "is arbitrary, capricious, contrary to law, or unsupported by substantial evidence," Barnick v. United States, 591 F.3d 1372, 1377 (Fed. Cir. 2010).  A plaintiff must show by "cogent and clearly convincing evidence" that

the decision of the military correction board fails this standard.  Wronke v. Marsh, 787 F.2d 1569, 1576 (Fed. Cir. 1986) (internal quotation marks omitted).

"The arbitrary and capricious standard . . . is highly deferential," Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and requires the court to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (internal quotation marks omitted).  When determining whether a decision of a military correction board is supported by substantial evidence--or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (internal quotation marks omitted)--the court must consider "the record in its entirety . . . , including the body of evidence opposed to the Board's view," id. at 488.  When applying the APA standard of review, the court cannot substitute its judgment for that of the military correction board.  See Heisig v. United States, 719 F.2d 1153, 1156-57 (Fed. Cir. 1983) (stating that the court should not reweigh the evidence that was before the military correction board, but, instead, should determine "whether the conclusion being reviewed is supported by substantial evidence" (emphasis omitted)); see also Sanders v. United States, 219 Ct. Cl. 285, 302, 594 F.2d 804, 814 (1979) (en banc) ("[W]hile [the court] may disagree with a correction board about whether or not a specific situation was unjust, [the court] will not substitute [its] judgment for the board's when reasonable minds could reach differing conclusions."), superseded by statute on other grounds, Defense Officer Personnel Management Act, Pub. L. No. 96-513, sec. 105, 94 Stat. 2835, 2859-60 (1980) (codified as amended at 10 U.S.C. § 628), as recognized in Richey v. United States, 322 F.3d 1317, 1320 (Fed. Cir. 2003).

The court's review of decisions of military correction boards is limited to the administrative record that was before the board.  Metz v. United States, 466 F.3d 991, 998 (Fed. Cir. 2006).  When reviewing the administrative record, there is a "strong presumption that military officials, including those sitting on the ABCMR, have acted in accordance with the law."  Cameron v. United States, 106 Fed. Cl. 551, 560-61 (2012) (citing, inter alia, Bockoven v. Marsh, 727 F.2d 1558, 1563 (Fed. Cir. 1984)); see Boyle v. United States, 101 Fed. Cl. 592, 596 (2011) (noting the "the presumption of regularity that attaches to the actions of a correction board" (citing Richey, 322 F.3d at 1326)).  "Notwithstanding that deference, the military must follow any regulations it issues."  Cameron, 106 Fed. Cl. at 561 (citing Fisher, 402 F.3d at 1177).

III.     Discussion

     A.     Jurisdiction

     1.     Plaintiff's Claims Under 37 U.S.C. § 204 and 10 U.S.C. § 1201 Are Properly Before the Court

The Military Pay Act, 37 U.S.C. § 204, and 10 U.S.C. § 1201, which governs disability retirement pay, are the sources of substantive law upon which plaintiff bases his Tucker Act suit.  Compl. ¶ 1; see id. ¶ 92(b) (requesting the pay Mr. Watson would have received but for his alleged wrongful discharge--thus providing a basis for a Military Pay Act claim); id. ¶¶ 73-74 (claiming that, had Mr. Watson been referred to an MEB, he would have been assigned a 30% disability rating and would "have been medically retired"--thus providing a basis for a 10 U.S.C. § 1201 claim); Pl.'s Resp. 8 (stating that Mr. Watson "seek[s] medical retirement and disability benefits" pursuant to 10 U.S.C. § 1201); cf. Jan's Helicopter Serv., Inc., 525 F.3d at 1306 (stating that a separate money-mandating source of law is necessary for Tucker Act jurisdiction).  The court is satisfied that these claims are properly before the court.

First, it is well-established that both the Military Pay Act, 37 U.S.C. § 204(a), and 10 U.S.C. § 1201 are money-mandating statutes.  See Chambers v. United States, 417 F.3d 1218, 1223 (Fed. Cir. 2005) (stating that 10 U.S.C. § 1201 is money mandating); Martinez, 333 F.3d at 1303 (stating that the Military Pay Act is money-mandating).  The Military Pay Act provides that a soldier on active duty is entitled to the basic pay of his pay grade in accordance with his years of service.  37 U.S.C. § 204(a).  Therefore, if a plaintiff can establish that he was unlawfully discharged from the Army, his "statutory right to pay [under the Military Pay Act] continues," and "this right serves as the basis for Tucker Act jurisdiction."  Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir. 1997).  A plaintiff can "also file a proper Tucker Act claim for entitlement to military disability pay under 10 U.S.C. § 1201."  Fulbright v. United States, 97 Fed. Cl. 221, 228 (2011), aff'd per curiam, 480 Fed. App'x 998 (2012).  Section 1201 of title 10 provides that a soldier may receive disability retirement pay if the Secretary of the Army retires the soldier after a determination that the soldier is "unfit to perform the duties of [his] office, grade, rank, or rating because of physical disability incurred while entitled to basic pay."  10 U.S.C. § 1201(a).  More specifically, a soldier with fewer than twenty years of service is eligible for disability retirement pay if he is found unfit for duty and his disability is permanent, was incurred in the line of duty and is rated "at least 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs."  Id. § 1201(b); cf. id. § 1203 (providing that a soldier with a disability rating of less than thirty percent, but who otherwise meets the requirements of 10 U.S.C. § 1201, is eligible for disability severance pay).

Second, plaintiff's claims under both the Military Pay Act and 10 U.S.C. § 1201 accrued within the court's six-year statute of limitations.  Cf. 28 U.S.C. § 2501 (providing for six-year statute of limitations).  Claims under the Military Pay Act accrue at the time the plaintiff was discharged from active duty.  See Martinez, 333 F.3d at 1303; Fuentes v. United States, 100 Fed. Cl. 85, 90 (2011).  Mr. Watson was involuntarily discharged from the Army on July 11, 2008, Compl. ¶ 6, and filed his Complaint in this court on November 16, 2012, see generally id.  Claims under 10 U.S.C.

§ 1201, however, do not accrue until a competent military board either refuses to hear the claim or denies the claim in a final decision.  See Chambers, 417 F.3d at 1224-25 (stating that "claims of entitlement to disability retirement pay generally do not accrue until the appropriate military board either finally denies such a claim or refuses to hear it").  Where, as here, a plaintiff is discharged from active service without review by an MEB or PEB, and "the Correction Board [(here, the ABCMR)] becomes the first proper board to act (or to be asked to act) on the matter," the claim does not accrue until the correction board makes a final decision.  Id. at 1225 (internal quotation marks omitted).  The Board denied the relief requested by Mr. Watson on October 18, 2012, AR 8, 22 (ABCMR record); see id. at 10 (describing plaintiff's argument that, had Mr. Watson been referred to an MEB, he would have been assigned a "minimum disability rating of 30 percent" and would "have been medically retired"); cf. supra note 4 (noting that the Board granted Mr. Watson's request that he be awarded a Purple Heart), and Mr. Watson filed his Complaint in this court on November 16, 2012, see generally Compl.

2.    Some of Plaintiff's Requests for Equitable Relief Are Properly Before the Court

The court is satisfied that it has jurisdiction to award plaintiff some of the equitable relief he requests.  Cf. Compl. ¶ 92 (listing the relief Mr. Watson requests).  First, "as an incident of and collateral to" Mr. Watson's claims for back pay and allowances associated with his alleged unlawful discharge, the court has jurisdiction to void Mr. Watson's discharge and to reinstate him to active duty to allow for disability evaluation processing.  See U.S.C. § 1491(a)(2) (stating that "as an incident of and collateral to" a money judgment, this court may "issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records"); Tippett v. United States, 28 Fed. App'x 942, 945 (Fed. Cir. 2011) (finding that the plaintiff was improperly discharged from the Army and directing this court, on remand, to vacate the plaintiff's discharge and reinstate him to active duty); see also Anderson v. United States, 111 Fed. Cl. 572, 579 (2013) (stating that claims for back and allowances, when brought pursuant to a wrongful discharge claim under the Military Pay Act, are within this court's jurisdiction (citing, inter alia, Metz, 466 F.3d at 998)); Peoples v. United States, 87 Fed. Cl. 553, 568 (2009) (holding that the court has jurisdiction over a claim for "back pay incident to a return to active duty (for a fitness determination by the PEB)" when requested pursuant to a wrongful discharge claim under the Military Pay Act); cf. Dodson v. Dep't of the Army, 988 F.2d 1199, 1208 (Fed. Cir. 1993) (stating that "an enlisted serviceman who has been improperly discharged is entitled to recover pay and allowances only to the date on which his term of enlistment would otherwise have expired").

However, the court does not have jurisdiction to "restore Mr. Watson to the grade of E-4 effective May 2, 2008."  Cf. Compl. ¶ 92(c).  Plaintiff's grade was reduced to E-1 by summary court-martial on May 2, 2008, AR 15 (ABCMR record), and, as discussed

below, see infra Part III.A.3, this court can review court-martial proceedings only under very limited circumstances, none of which is alleged here, see Moore v. United States, 61 Fed. Cl. 146, 150 (Fed. Cl. 2004) (stating that this court "may only review serious constitutional or jurisdictional defects in [court-martial] proceedings"), aff'd per curiam, 121 Fed. App'x 857 (2005).

3.  The Court Does Not Construe the Complaint as a Collateral Attack on Mr. Watson's Court-Martial Conviction

Defendant contends that, because "[t]he crux of Mr. Watson's complaint is that the court-martial conviction that led to his discharge should be voided," the court should construe plaintiff's complaint as "a collateral attack upon his court-martial conviction." Def.'s Mot. 14 (citing Compl. ¶ 90). Defendant further argues that, because plaintiff does not allege that a constitutional or jurisdictional defect rendered the court-martial proceeding devoid of "'fundamental fairness,'" this court lacks jurisdiction to review Mr. Watson's court-martial conviction. Id. at 15 (quoting Bowling v. United States, 713 F.2d 1558, 1561 (Fed. Cir. 1990)).

Plaintiff argues that the Army's involuntary discharge of Mr. Watson was not related to his court-martial sentence and that the Army could have discharged Mr. Watson without the court-martial conviction. Pl.'s Mot. 23. Therefore, according to plaintiff, "the court-martial is practically immaterial to [Mr. Watson's] claims." Id.; see id. (claiming that "the nexus between Mr. Watson's claims here and his court-martial is the simple fact that the court-martial adjudicated, by guilty plea, an allegation of misconduct that also led to his involuntary [discharge]"). Plaintiff maintains that "[t]he crux of Mr. Watson's complaint is that the Army failed to refer him to a MEB . . . and unlawfully deployed him to combat," id. at 23-24, and that "Mr. Watson's court-martial conviction is simply another adverse consequence that flowed from the Army's failure to adhere to its own regulations," id. at 24.

It is well-established that a plaintiff cannot seek direct review of a court-martial conviction in this court. Bowling, 713 F.2d at 1560; Longval v. United States, 41 Fed. Cl. 291, 294 (1998) ("Case law stipulates that civilian courts may not retry military court-martial proceedings." (citing, inter alia, Bowling, 713 F.2d at 1560-61)). Under a narrow exception to this rule, a plaintiff may collaterally attack a court-martial conviction in this court on the grounds that the court-martial proceedings were so "depriv[ed] of fundamental fairness" that they impaired the plaintiff's due process rights. Bowling, 713 F.2d at 1560-61; see Longval, 41 Fed. Cl. at 295 (stating that this court may only review court-martial proceedings if a plaintiff can establish "by clear and convincing evidence that: (1) significant constitutional defects existed that deprived [the plaintiff] of due process; (2) the court-martial proceeding lacked fundamental fairness, and (3) the court's reexamination does amount to a retrial of the case"). That is, this court possesses jurisdiction to review a plaintiff's court-martial conviction only if the plaintiff alleges a

constitutional defect in the court-martial proceedings. Moore, 61 Fed. Cl. at 150; see Artis v. United States, 205 Ct. Cl. 732, 740, 506 F.2d 1387, 1391 (1974) ("We can examine court-martial proceedings only in those rare instances where a serviceman who has been convicted in a court-martial trial sues in our court for back pay and collaterally attack[s] the court-martial proceedings on the ground that he was deprived of his constitutional rights in such proceedings." (emphasis omitted)). The foregoing precedents do not bar plaintiff's claims here, however, because the plaintiff in this case does not seek review of his court-martial conviction.

The court agrees with plaintiff that Mr. Watson did not seek review of his court-martial conviction before the Board and "does not do so here." See Pl.'s Mot. 23; see also Pl.'s Resp. 3 (stating that plaintiff "seeks review of the decision of the ABCMR, which considered and adjudicated his claims of error and injustice"). The court further agrees with plaintiff that paragraph 90 of the Complaint "does not convert Mr. Watson's request for judicial review of the ABCMR decision into one for collateral review of his court-martial conviction." Pl.'s Resp. 9; cf. Compl. ¶ 90 ("The Army's charge and conviction of Mr. Watson was contrary to law. His discharge for misconduct--commission of a serious offense--therefore was unlawful."). Moreover, defendant does not point to any evidence in the record, and the court is aware of none, that suggests that plaintiff's involuntary discharge was the direct result of his court martial conviction. Cf. AR 137 (separation action mem.) (stating that an action to separate Mr. Watson from active service was being initiated for three reasons: missing movement by design, wrongful disposal of weapon and disobeying officers on several occasions). Because plaintiff does not request that this court void or otherwise alter his court-martial conviction, the court does not construe the Complaint as a collateral attack on Mr. Watson's court-martial conviction.[12]

Based on the foregoing, the court DENIES defendant's motion to dismiss for lack of jurisdiction.

      B.      Cross-Motions for Judgment on the Administrative Record

      1.      The Scope of Any Waiver to Which Mr. Watson Agreed Did Not Preclude Mr. Watson From Seeking Relief From the Board and Does Not Bar Judicial Review of the Board's Decision

---

[12] Given the court's finding that plaintiff is not seeking review of his court-martial conviction, the court considers it unnecessary to address defendant's argument that Mr. Watson "has waived his right to judicial review of his court-martial conviction." See Def.'s Mot. to Dismiss or, Alternatively, for J. upon the Admin. R. (Def.'s Mot.), Dkt. No. 15, at 18-19.

Defendant contends that "Mr. Watson has waived his right to judicial review of his discharge and separation."  Def.'s Mot. 15 (emphasis and some capitalization omitted). In support of its position, defendant analogizes to cases in which service members were found to have waived the right to challenge informal PEBs' findings by signing documents waiving their right to formal PEBs.  Id. at 16-17 (discussing, inter alia, Gant v. United States, 417 F.3d 1328 (Fed. Cir. 2005) and Nickerson v. United States, 35 Fed. Cl. 581 (1996))[13]; cf. supra Part I.A (discussing informal and formal PEBs).  As defendant correctly notes, Mr. Watson signed the rights advisement memorandum and initialed next to the paragraphs stating that he waived his right to have his case heard by an administrative separation board, to appear personally before the administrative

---

[13]   In defendant's Response, defendant contends that "this Court lacks jurisdiction to entertain the complaint because Mr. Watson has waived his right to judicial review of his discharge and separation from the Army."  Def.'s Opp'n to Pl.'s Cross-Mot. for J. on the Admin. R. and Reply in Supp. of  Mot. to Dismiss or, Alternatively, for J. on the Admin. R. (Def.'s Resp.), Dkt. No. 172, at 2 (citing Nickerson v. United States, 35 Fed. Cl. 581 (1996)). However, Nickerson is not persuasive authority for the proposition that any waiver of Mr. Watson's right to challenge his discharge deprives the court of jurisdiction.

The court in Nickerson held that, because the plaintiff failed to challenge his voluntary discharge, "the court may properly determine that he waived any right to now challenge the discharge decision in a judicial forum."  Nickerson, 35 Fed. Cl. at 587.  The court found that, because the plaintiff signed a form agreeing that he had been counseled as to the findings of the Physical Evaluation Board (PEB) and chose not to request a formal hearing, he had "voluntarily departed from military service."  Id.  The court dismissed the complaint on jurisdictional grounds, citing to the Sammt case holding that courts lack jurisdiction to hear claims for back pay brought by service members who voluntarily separate from service.  Id. at 588 (citing Sammt v. United States, 780 F.2d 31, 33 (Fed. Cir. 1985)).

The court does not understand it to be defendant's position that plaintiff voluntarily resigned from the military and therefore cannot prevail on the merits of his Military Pay Act claim.  Defendant discusses Nickerson only in the context of waiver.  See Def.'s Mot. 16-18; Def.'s Resp. 10-11.  Additionally, defendant notes plaintiff's contention that Nickerson does not apply because plaintiff--unlike the plaintiff in Nickerson--was involuntarily discharged.  Def.'s Resp. 10.  Defendant responds that "[t]his is not a meaningful distinction," not that plaintiff's discharge was, in fact, voluntary.  Id.  Accordingly, the court understands defendant to be citing Nickerson only for the proposition that, because plaintiff waived his right to judicial review, the court should dismiss on jurisdictional grounds.

However, in light of the en banc decision in Fisher v. United States, 402 F.3d 1167 (Fed. Cir. 2005) (en banc), "the issue of the voluntariness of a plaintiff's discharge is not jurisdictional; rather it is a question that should be considered in the context of the merits of a plaintiff's case in determining whether a plaintiff can take advantage of [the Military Pay Act's] money-mandating status."  Metz v. United States, 466 F.3d 991, 998 (Fed. Cir. 2006).  Therefore, the Sammt case no longer supports the point for which the Nickerson court cited it.

separation board and to submit written materials on his own behalf.  Def.'s Mot. 15; see also AR 135-36 (rights advisement mem.).  Mr. Watson also agreed that he had been advised of his rights by consulting counsel and declined both his right to further consultation with counsel and his right to be represented by counsel.  AR 135 (rights advisement mem.); see also Def.'s Mot. 15.[14]  As a result, defendant argues, the court should enter judgment on the administrative record in defendant's favor on the basis of waiver.  See Def.'s Mot. 18.

Plaintiff responds that cases addressing waiver of the right to a formal PEB are not relevant to this case, in which Mr. Watson waived his right to a hearing before an administrative separation board.  See Pl.'s Mot. 21.  Additionally, plaintiff contends that "[i]t is now well-established that a waiver of a right to a formal PEB is not a waiver of the right to judicial review of a correction board decision that considers allegations of error and injustice in the [in]formal PEB decision."  Pl.'s Resp. 5.

When determining whether a service member waived his right to a formal PEB and subsequent judicial review, courts examine:  (1) whether the service member did in fact waive his right to a formal PEB; (2) whether the waiver was voluntary or should be disregarded on the basis that it was involuntary; and (3), if the waiver was voluntary, the scope of the waiver.  Stine v. United States, 92 Fed. Cl. 776, 791-92 (2010), aff'd, 417 Fed. App'x 979 (Fed. Cir. 2011); see Gant, 417 F.3d at 1331 (concluding that the trial court had addressed both the voluntariness and scope of the waiver the plaintiff had signed); Van Cleave v. United States, 403 F.3d 1341, 1344 (Fed. Cir. 2005) (finding that the service member had voluntarily waived his right to a formal PEB but that remand was necessary to determine the scope of the waiver).

Assuming for the sake of argument that it would be appropriate to extend the cases discussing waiver of a formal PEB to plaintiff's waiver of his right to an administrative separation board, cf. Def.'s Mot. 16-18 (analogizing plaintiff's waiver to waiver of the right to a formal PEB); Pl.'s Mot. 21 (stating that cases addressing waiver of the right to a formal PEB are "inapposite"), and further assuming that any waiver was voluntary, cf. Def.'s Mot. 17-18 (discussing voluntariness); Pl.'s Mot. 17-18 (same), the court agrees with plaintiff that the scope of the waiver Mr. Watson signed did not preclude judicial review of the Board's decision declining to correct Mr. Watson's military records, cf. Pl.'s Resp. 3-5.

Courts have indeed consistently held that a service member's waiver of the right to challenge an informal PEB's findings before a formal PEB is also a waiver of the service member's right to judicial review of the informal PEB decision.  See, e.g., Gant, 417 F.3d

---

[14]  In further support of its position, defendant makes an argument based on evidence that is not in the administrative record.  See Def.'s Resp. 2-3 (describing "the sequence of events that led to Mr. Watson's discharge").  Because this evidence is not in the administrative record, see supra note 10, the court does consider this portion of defendant's argument or plaintiff's response to it.

at 1332 ("[W]e agree with [the] trial court that Mr. Gant knowingly and voluntarily accepted the finding of unfitness for duty and the disability rating assigned to him by the [informal] PEB and that he has not shown any reason that he should be permitted to challenge those determinations in subsequent administrative or judicial proceedings."); Warner v. United States, 103 Fed. Cl. 408, 413 (2012) ("[W]aiver of a formal PEB review also acts as a waiver of judicial review of the [informal PEB]."); Williams v. United States, 100 Fed. Cl. 263, 277 (2011) ("Having voluntarily accepted his thirty percent disability ratings by concurring with the informal PEBs' determinations and waiving his right to formal PEB hearings, Mr. Williams agreed to be bound by the informal PEBs' decisions.").

However, nearly every court to consider the question has held that such a waiver does not bar the service member from petitioning the relevant correction board for correction of his military records or from subsequently challenging the decision of the correction board in the Court of Federal Claims. See, e.g., Jardon v. United States, No. 10-738C, 2013 U.S. Claims LEXIS 118, at *44 (Fed. Cl. Feb. 14, 2013) ("[W]aiver of a formal PEB does not waive [the plaintiff's] right to seek judicial review of the [correction board] . . . decision[] in his case."); Stine, 92 Fed. Cl. at 794 ("[T]he written waiver does not cover Mr. Stine's right to seek correction of his naval records before the [correction board] or this Court's subsequent review of the [correction board's] decision."); Rominger v. United States, 72 Fed. Cl. 268, 272 (2006) ("[W]hen Mr. Rominger accepted the informal PEB determination, he did not waive his right to judicial review of the [correction board's] decision not to correct his military record."); Van Cleave v. United States, 66 Fed. Cl. 133, 136 (2005) ("Plaintiff's voluntary waiver of a formal PEB precludes judicial review of the informal PEB's determination. Yet that waiver does not preclude judicial review of the [correction board]." (internal citation omitted)). But see Maier v. Orr, 754 F.2d 973, 984 (Fed. Cir. 1985) (stating in dicta that it would not have been error for the trial court to determine that the plaintiff, who had sought correction of his military records from the relevant correction board, had waived his right to judicial review of his wrongful discharge claim by not challenging it at the time he was discharged); Nickerson, 35 Fed. Cl. at 587 (holding that, because the "plaintiff voluntarily accepted his discharge rather than challenging it at the time it was issued, the court may properly determine that he waived any right to now challenge the discharge decision in a judicial forum and dismiss the complaint.). Additionally, the court notes that the rights advisement memorandum signed by Mr. Watson stated that Mr. Watson "waive[d] consideration of [his] case by an administrative separation board," but did not state that Mr. Watson waived his right to review by the Board or this court. See AR 135 (rights advisement mem.).

Therefore, to the extent that the caselaw applicable to waiver of a formal PEB is relevant to plaintiff's waiver of his right to a hearing before an administrative separation board, the court finds that the scope of Mr. Watson's waiver did not encompass his right to petition the Board for correction of his military records or his right to challenge the decision of the Board in the Court of Federal Claims. Cf. Gant, 417 F.3d at 1331; Van

Cleave, 403 F.3d at 1344; Stine, 92 Fed. Cl. at 791-92.  Defendant's request for judgment on the administrative record on the basis of waiver is therefore DENIED.

      2.      The Board's Finding that the Army Was Not Required to Refer Mr. Watson to an MEB Was Contrary to Law and Unsupported by Substantial Evidence

Plaintiff argued before the Board that he was diagnosed with both optic nerve atrophy and optic neuritis in the fall of 2006, and that, pursuant to chapter 3 of Army Regulation 40-501, the diagnosis of one or both of these conditions obligated the Army to refer Mr. Watson to an MEB.  AR 10 (ABCMR record); cf. Army Reg. 40-501 ¶ 3-15(c) (providing that "[a]trophy of the optic nerve due to disease" is a cause for referral to an MEB); id. ¶ 3-30(e) (providing that "optic neuritis" is a cause for referral to an MEB).  Based on the evidence in the record, the Board found that Mr. Watson "was never issued a permanent '3' profile, and he was never diagnosed with any medical issue/disorder that required referral to an MEB/PEB during his active duty service."  AR 19 (ABCMR record).  The Board further found that "there [was] no evidence that shows [Mr. Watson] was diagnosed with optic neuritis or MS while he was on active duty."  Id. at 19-20.  Accordingly, the Board denied Mr. Watson's requests for relief.  Id. at 22; cf. supra note 4 (noting that the Board granted Mr. Watson's request that he be awarded a Purple Heart).  Plaintiff argues that the Board's "conclusion was arbitrary, capricious, unsupported by substantial evidence, and contrary to law."  See Pl.'s Mot. 26; cf. id. (arguing that "the ABCMR cherry-picked language from medical reports to support its position").  Defendant counters that "the ABCMR reasonably and lawfully applied the evidence of record to the applicable regulations and concluded that the Army was not required to refer Mr. Watson to an MEB."  Def.'s Mot. 24; see id. at 20 (arguing that "[t]he ABCMR addressed Mr. Watson's claims in a well-reasoned, 15-page opinion").

As an initial matter, plaintiff's argument here and before the Board is premised on the contention that certain provisions in chapter 3 of Army Regulation 40-501 obligate the Army to refer a soldier diagnosed with either optic nerve atrophy or optic neuritis to an MEB.  See AR 10 (ABCMR record) (describing Mr. Watson's argument that, once he was diagnosed with optic nerve atrophy and optic neuritis, Army Regulation 40-501 required the Army to refer him to an MEB); Pl.'s Mot. 35 (similar); cf. Army Reg. 40-501 ¶ 3-15(c) (providing that "[a]trophy of the optic nerve due to disease" is a cause for referral to an MEB); id. ¶ 3-30(e) (providing that "optic neuritis" is a cause for referral to an MEB).  The Army Regulations provide a few mechanisms by which a soldier can be referred to an MEB.  See, e.g., Army Reg. 40-501 ¶ 3-4; id. ¶ 7-4(a)(1); Army Reg. 635-40 ¶ 4-9.  Relevant here, Army Regulation 40-501 ¶ 3-4 provides that "[p]hysicians are responsible for referring soldiers with conditions listed [in chapter 3] to an MEB."  Army Reg. 40-501 ¶ 3-4; cf. id. ¶ 3-3(d) (stating that "[p]hysicians who identify soldiers with medical conditions listed in [chapter 3] should initiate an MEB at the time of identification" and that they "should not defer initiating the MEB until the soldier is being processed for nondisability retirement").  And Army Regulation 40-501 ¶ 3-3

provides that "[s]oldiers with conditions listed in [chapter 3] who do not meet the required medical standards will be evaluated by an MEB."  Army Reg. 40-501 ¶ 3-3; <u>see</u> Army Reg. 635-40 ¶ 3-1(a) (stating that the medical retention qualification standards set forth in chapter 3 of Army Regulation 40-501 "are used to refer Soldiers to a MEB").

Other than observing that an MEB makes decisions "as to the Soldier's medical qualification for retention based on the criteria in Army Regulation 40-501, chapter 3," the Board did not directly address any provisions in chapter 3 of Army Regulation 40-501.  <u>See</u> AR 18.  Instead, the Board observed that the "available record [did] not contain any documentation that shows . . . that [Mr. Watson] was ever given a permanent profile, or that he was subsequently diagnosed with any medical issues/disorders that prevented him from fully performing his military duties."  AR 13 (ABCMR record); <u>see also</u> <u>id.</u> at 19; <u>cf.</u> Def.'s Mot. 20-21 ("Mr. Watson was repeatedly examined by doctors from the time of his initial visit in 2006 until his ultimate separation from service, yet none of his treating physicians deemed it necessary to restrict Mr. Watson's activities permanently, much less refer him to an MEB because he had a medical condition that limited his ability to perform the duties of his office, grade, and rank."); <u>supra</u> Part I.B (discussing Mr. Watson's assignment to a temporary physical profile of three).

Plaintiff argues that the Board's observation that Mr. Watson was never issued a permanent physical profile is immaterial.  Pl.'s Mot. 31.  Defendant argues that the Army is obligated to refer a soldier to an MEB only if the soldier is diagnosed with a condition listed in chapter 3 of Army Regulation 40-501 <u>and</u> a physician deems the condition permanent.  <u>See</u> Def.'s Suppl. Br. 3-4.  As support for this argument, defendant relies on Army Regulation 40-501 ¶ 7-4(a)(1).  <u>Id.</u> at 4.  Army Regulation 40-501 ¶ 7-4(a)(1) provides that if a soldier is assigned a permanent physical profile, "the profiling officer must assess if the soldier meets retention standards by chapter 3 [of Army Regulation 40-501]," and, if not, the profiling officer "must" refer the soldier to an MEB."  Army Reg. 40-501 ¶ 7-4(a)(1); <u>cf.</u> <u>id.</u> ¶ 7-6 (addressing who may be designated as a profiling officer).  The court views Army Regulation 40-501 ¶ 7-4(a)(1) as simply another mechanism by which the Army may refer a soldier to an MEB.  Accordingly, the fact that a permanent physical profile is a prerequisite for referral to an MEB under Army Regulation 40-501 ¶ 7-4(a)(1) is not relevant to the conditions for referral under Army Regulation 40-501 ¶ 3-4.  Indeed, issuance of a permanent physical profile does not appear to be prerequisite for a soldier to be referred to an MEB under Army Regulation 40-501 ¶ 3-4.  <u>Id.</u> ¶ 3-4 ("Physicians are responsible for referring soldiers with conditions listed [in chapter 3] to an MEB."); <u>see also</u> <u>id.</u> ¶ 3-3 ("Soldiers with conditions listed in this chapter who do not meet the required medical standards will be evaluated by MEB . . . .").

With respect to the Board's conclusion that Mr. Watson was not diagnosed with any condition "that prevented him from fully performing his military duties," AR 13 (ABCMR record), as plaintiff correctly points out, "Army Regulation 40-501, Chapter 3,

specifically identifies those conditions that, regardless of their severity, do not meet retention standards and therefore require immediate referral to a[n] MEB," and "distinguishes those conditions from others, such as arthritis, that may fall below retention standards depending on their severity and/or impact on duty performance." Pl.'s Mot. 31-32; cf. Army Reg. 40-501 ¶ 3-14(a) (stating that "[a]rthritis due to infection" is cause for referral to an MEB only if it is "associated with persistent pain and marked loss of function with objective x-ray evidence and documented history of recurrent incapacity for prolonged periods"); id. ¶ 3-3(d) (stating that "[m]any of the conditions listed in [chapter 3] (for example, arthritis . . .) fall below retention standards only if the condition has precluded or prevented successful performance of duty"). Chapter 3 of Army Regulation 40-501 suggests that, unlike arthritis, both optic neuritis and atrophy of the optic nerve are conditions that necessarily cause a soldier to fall below medical retention standards and therefore require referral to an MEB. See Army Reg. 40-501 ¶ 3-15(c) (providing that "[a]trophy of the optic nerve due to disease" is a cause for referral to an MEB); id. ¶ 3-30(e) (providing that "optic neuritis" is a cause for referral to an MEB); cf. id. ¶ 3-3 ("Soldiers with conditions listed in this chapter who do not meet the required medical standards will be evaluated by MEB . . . ."). Accordingly, the court agrees with plaintiff that, if Mr. Watson was diagnosed with either optic neuritis or atrophy of the optic nerve, the diagnosing physician was obligated to refer Mr. Watson to an MEB. See Army Reg. 40-501 ¶ 3-4 ("Physicians are responsible for referring soldiers with conditions listed [in chapter 3] to an MEB."); id. ¶ 3-3(d) ("Physicians who identify soldiers with medical conditions listed in [chapter 3] should initiate an MEB at the time of identification."); Stuart v. United States, 108 Fed. Cl. 458, 465 (2013) (stating that, under Army Regulation 40-501 ¶ 3-3(d), "if a physician identified a soldier with a medical condition that did not meet retention standards, the physician was charged with referring that soldier to the Physical Disability Evaluation System, and [an MEB] was mandatory").[15]   Therefore, to the extent that the Board concluded that a diagnosis of optic nerve atrophy or optic neuritis does not require referral of a soldier to an MEB, this conclusion is contrary to law, and, insofar as plaintiff requests judgment on the administrative record as to this issue, plaintiff's Motion is GRANTED.

The court now addresses whether the Board's conclusion that Mr. Watson was never diagnosed with any condition that required referral to an MEB was arbitrary,

---

[15]   The court's analysis in Stuart v. United States, 108 Fed. Cl. 458 (2013), was most likely based on the version of Army Regulation 40-501 in effect in September 2009, when the plaintiff in that case was discharged, cf. id. at 465 n.7 (noting that the court was relying on the version of Army Regulation 645-40 in effect when the plaintiff was discharged). The text of Army Regulation 40-501 ¶ 3-3(d) in effect in September 2009 is identical to the version of Army Regulation 40-501 ¶ 3-3(d) in effect in October 2006. Compare Army Reg. 40-501 ¶ 3-3(d) (effective Dec. 14, 2007 with a "Rapid Action Revision (RAR) Issue Date [of] 10 September 2008") with Army Reg. 40-501 ¶ 3-3(d) (effective Feb. 1, 2005); cf. supra note 7 (addressing the court's reliance on the version of Army Regulation 40-501 in effect in October 2006).

capricious, unsupported by substantial evidence or contrary to law.  Cf. AR 19-20 (ABCMR record).

       a.      Atrophy of the Optic Nerve Due to Disease

The Board observed that Mr. Watson "was diagnosed with optic atrophy" by Dr. Chung of the Vilseck optometry clinic on October 13, 2006 but emphasized that, according to the record of the visit, Mr. Watson's symptoms were "possibly due to stroke" and that "[s]everal tests were performed with no abnormalities noted."  AR 12 (ABCMR record); cf. AR 40-41 (Oct. 13, 2006 CRMC).  The court is perplexed by the Board's failure to acknowledge that Dr. Chung diagnosed Mr. Watson with optic atrophy on four separate occasions.  See AR 41 (Oct. 13, 2006 CRMC); AR 43 (Oct. 16, 2006 CRMC); AR 47 (Oct. 18, 2006 CRMC); AR 61 (Nov. 22, 2006 CRMC); cf. Def.'s Mot. 3-4, 22-23 (conceding that Mr. Watson was diagnosed with optic atrophy).  The court is also perplexed by the Board's emphasis on the fact that, on one of these occasions, Dr. Chung opined that Mr. Watson's symptoms may have been due to a stroke.  See AR 12 (ABCMR record).  Further, although the record indicates that many of the tests performed on each of these occasions presented no abnormalities, the record is clear that Mr. Watson had 20/400 vision in his left eye as compared to 20/20 vision in his right eye. See AR 40-41 (Oct. 13, 2006 CRMC); AR 42-43 (Oct. 16, 2006 CRMC); AR 47 (Oct. 18, 2006 CRMC); AR 60-61 (Nov. 22, 2006 CRMC); cf. AR 112 (PubMed Health website excerpt) (stating that the symptoms of optic nerve atrophy include dimmed vision, a reduced field of vision and an inability to see fine detail).

Defendant argues that Mr. Watson's diagnosis of optic atrophy was not due to disease and that, therefore, Dr. Chung was not required to refer Mr. Watson to an MEB. See Def.'s Mot. 22-23; Def.'s Resp. 16; cf. Army Reg. 40-501 ¶ 3-15(c) (providing that that "[a]trophy of the optic nerve due to disease" is cause for referral to an MEB (emphasis added)).  According to defendant, during the October 13, 2006 visit, Dr. Chung "was unable to determine the cause of Mr. Watson's atrophy definitively, and attributed it 'possibly' to a stroke, rather than disease."  Def.'s Mot. 22; cf. AR 41 (Oct. 13, 2006 CRMC) (diagnosing Mr. Watson with "optic atrophy:  possibly due to stroke" (capitalization omitted)).  Defendant also notes that Dr. Chung "did not specify a cause" for Mr. Watson's optic atrophy diagnosis on any other occasion.  Def.'s Mot. 22; cf. AR 43 (Oct. 16, 2006 CRMC); AR 47 (Oct. 18, 2006 CRMC); AR 61 (Nov. 22, 2006 CRMC).

Plaintiff counters that defendant's argument is merely a "post hoc rationalization of counsel" because the Board did not rely on this line of reasoning in reaching its findings.  Pl.'s Mot. 29.  The court agrees.  Cf. Def.'s Resp. 18 (conceding that the Board "did not discuss optic atrophy specifically"); Verbeck v. United States, 97 Fed. Cl. 443, 460 n.25 (2011) (noting that government arguments aimed at "substantiat[ing]" the Board's conclusions" and "submitted for the first time in response to [the plaintiff's]

petition for judicial review" amounted to "improper post hoc justification[s]" (some alterations in original) (internal quotation marks omitted).  The court also notes that "disease" is not defined in Army Regulation 40-501, see Army Reg. 40-501, Glossary, and that there is no support in the record for defendant's contention that the term disease, as it is used in Army Regulation 40-501 ¶ 3-15(c), excludes strokes, see AR 112 (PubMed Health website excerpt) (stating that optic nerve atrophy "can be caused by diseases of the brain and central nervous system, such as[] . . . [s]troke").[16]

Given the foregoing, the court concludes that the Board's finding that Mr. Watson "was never diagnosed with any medical issue/disorder that required referral to an MEB/PEB during his active duty service," AR 19 (ABCMR record), is unsupported by substantial evidence.  Plaintiff has shown by clearly convincing evidence that Dr. Chung, a physician at an Army medical treatment facility, repeatedly diagnosed Mr. Watson with optic atrophy while Mr. Watson was on active duty.  AR 41 (Oct. 13, 2006 CRMC); AR 43 (Oct. 16, 2006 CRMC); AR 47 (Oct. 18, 2006 CRMC); AR 61 (Nov. 22, 2006 CRMC).  Accordingly, under chapter 3 of Army Regulation 40-501, Dr. Chung was required to refer Mr. Watson to an MEB.  See Army Reg. 40-501 ¶ 3-15(c) (providing that "[a]trophy of the optic nerve due to disease" is cause for referral to an MEB); id. ¶ 3-4 (providing that "[p]hysicians are responsible for referring soldiers with conditions listed [in chapter 3] to an MEB"); id. ¶ 3-3(d) ("Physicians who identify soldiers with medical conditions listed in [chapter 3] should initiate an MEB at the time of identification."). Insofar as plaintiff requests judgment on the administrative record as to this issue, plaintiff's Motion is GRANTED.

Although Mr. Watson's diagnosis of optic atrophy, alone, required the Army to refer him to an MEB, the court now addresses whether the record supports plaintiff's contention that Mr. Watson was also diagnosed with optic neuritis.

b.      Optic Neuritis

The Board found that "there [was] no evidence that shows [Mr. Watson] was diagnosed with optic neuritis . . . while he was on active duty."  AR 19-20 (ABCMR

---

[16]   Further, to the extent that defendant argues that "optic atrophy" is separate and distinct from "atrophy of the optic nerve," see Def.'s Mot. 22 ("[A]ssuming, for the sake of argument, that optic atrophy is the same thing as atrophy of the optic nerve . . . ."), the court finds this argument unavailing.  First, the Board did not rely on this line of reasoning in reaching its conclusions.  Cf. Verbeck v. United States, 97 Fed. Cl. 443, 460 n.25 (2011) (characterizing as "improper post hoc justification[s]" certain government arguments aimed at "substantiat[ing] the Board's conclusions" that were "submitted for the first time in response to [the plaintiff's] petition for judicial review" (some alterations in original) (internal quotation marks omitted)). Second, "optic atrophy" is listed as an alternative name for "optic nerve atrophy" on the PubMed Health website, an excerpt of which is included in the administrative record.  AR 112 (PubMed Health website excerpt).

record).  Plaintiff contends that this finding "is perplexing and completely contradicted by the evidence in the record."  Pl.'s Mot. 29.  The court agrees.

In support of its finding, the Board cited to medical records from Mr. Watson's September and October 2006 visits to the Amberg hospital.  See AR 12-13, 20 (ABCMR record); see supra Part I.B (discussing these visits).  With respect to Mr. Watson's September 15, 2006 visit to the Amberg hospital, the Board emphasized that Dr. Boessenecker noted that he had a "[s]trong [s]uspicion of past optical neuritis left," but that there was "[c]urrently no CERTAIN signs of a chronic [central nervous system] inflammation."  AR 37 (Sept. 15, 2006 medical rpt.); see AR 12, 20 (ABCMR record); cf. Def.'s Resp. 15 (stating that, "at best, [Dr. Boessenecker] suspected as of September 15, 2006, that Mr. Watson had suffered from optical neuritis in the past").  The Board also emphasized Dr. Boessenecker's note that the "diagnosis [could] not be made definitively."  AR 38 (Sept. 15, 2006 medical rpt.); see AR 12, 20 (ABCMR record); cf. AR 54 (Oct. 31, 2006 letter) (noting that Mr. Watson was released from the Amberg hospital in September "with no final diagnosis").

With respect to Mr. Watson's October 17, 2006 visit to the Amberg hospital, the Board emphasized Dr. Boessenecker's note that, although he had "no new diagnostic ideas, the best explanation for [Mr. Watson's] symptoms is an optic nerve neuritis" and that "[t]his optic nerve neuritis could be the beginning of a chronic . . . inflammatory central nervous system disease[,] but there are no further proofs for this diagnosis (for example encephalomyelitis disseminata)."  AR 44 (Oct. 17, 2006 letter); see AR 12-13 (ABCMR record).  The Board failed to address the fact that Dr. Boessenecker listed "[o]ptic nerve neuritis on the left side with [v]ision disturbance" as a diagnosis.  AR 44 (Oct. 17, 2006 letter).

With respect to Mr. Watson's October 30, 2006 visit to the Amberg hospital, the Board emphasized Dr. Schmidt's notation that, after reviewing Mr. Watson's history of treatment and conducting several examinations, he could not identify any "cogent reason for the patient['s] symptoms."  AR 53 (Oct. 30, 2006 letter); see AR 13 (ABCMR record).  The Board did not address the fact that Dr. Schmidt identified as one of Mr. Watson's diagnoses "[o]pticusneuritis [of the] left eye."  AR 53 (Oct. 30, 2006 letter); see AR 13 (ABCMR record).

In a letter dated October 31, 2006, Dr. Boessenecker appeared to backtrack from his October 17, 2006 optic nerve neuritis diagnosis.  See AR 54-55 (Oct. 31, 2006 letter).  Dr. Boessenecker noted that there was a "continued suspicion" that Mr. Watson's diagnosis was "chronic inflammatory disease of the central nervous system (encephalomyelitis disseminata)," id. at 54; see also id. at 55 ("At the present time we assume more likely a difficult-to-diagnose chronic inflammatory central nervous system disease . . . ."), and that the "suspected diagnosis of retrobulbar neuritis was . . . a probable diagnosis," id. at 55 (emphasis added); cf. AR 110 (PubMed Health website

excerpt) (listing "[r]etro-bulbar neuritis" as another name for "[o]ptic neuritis").  Dr. Boessenecker further noted that "various neurological diseases" could be excluded as possible diagnoses.  Id. at 54; cf. Army Reg. 40-501 ¶ 3-30(e) (listing optic neuritis as a neurological condition).

However, the record of Mr. Watson's February 2, 2007 visit to the Amberg hospital indicates that Dr. Boessenecker again diagnosed Mr. Watson with "[o]ptic nerve neuritis on the left side with vision disturbance."  AR 224 (Feb. 5, 2007 letter); cf. AR 44 (Oct. 17, 2006 letter) (listing a similar diagnosis).  Mr. Watson received an MRI during this visit, and Dr. Boessenecker recommended an ophthalmologic examination and a follow-up MRI in three months.  AR 224 (Feb. 5, 2007 letter).

The Board also failed to address records from Mr. Watson's October 23, 2006 visit with Dr. Hess at the Landstuhl ophthalmology clinic.  See supra Part I.B (discussing this visit).  During this visit, Mr. Watson provided Dr. Hess with his medical history, and Dr. Hess conducted a series of eye examinations, the results of which presented no abnormalities.  AR 48-49 (Oct. 23, 2006 CRMC); cf. id. at 48 (stating that the "[r]eliability of [the] source of patient information was good").  Dr. Hess then diagnosed Mr. Watson with optic neuritis and made a provisional diagnosis of optic atrophy.  Id. at 49.[17]

Given the foregoing, the court finds that the Board's determination that "there was no evidence that shows the applicant was diagnosed with optic neuritis . . . while on active duty," AR 19-20 (ABCMR record) (emphasis added), is unsupported by

---

[17]  In addition to the medical records associated with Mr. Watson's visits to the Amberg Hospital and Landstuhl ophthalmology clinic, plaintiff cites to the records from Mr. Watson's October 17, 2006 visit to an Army aid station and to various visits with certain VA doctors.  See Pl.'s Mot. 27-29.  The court can accord little weight to this evidence.

In the record associated with Mr. Watson's visit to the Army aid station, Captain Duncan noted that, while Mr. Watson was a patient at the Amberg hospital, "the diagnosis of left atrophic optic nerve was made and confirmed by Dr. . . . Chung."  AR 52 (Oct. 25, 2006 medical note).  However, it is not clear from the record whether Captain Duncan's statement was based on Mr. Watson's account of events or whether it was informed by Dr. Chung himself.  Therefore, this evidence is of uncertain value.

The records associated with Mr. Watson's visits with various VA doctors, see Pl.'s Mot. 28-29 (citing AR 242 (Feb. 26, 2009 medical note), 506 (Dec. 2, 2008 medical note), 563 (Aug. 27, 2009 medical note)), document visits that occurred after Mr. Watson was involuntarily discharged, cf. AR 16 (ABCMR record) (stating that Mr. Watson was discharged on July 11, 2008).  Accordingly, the court does not consider evidence concerning such visits to be relevant to the determination as to whether the Board erred in finding that the Army was not required to refer Mr. Watson to an MEB while he was on active duty.

substantial evidence.  The record indicates that Mr. Watson was diagnosed with optic neuritis by Dr. Boessenecker, Dr. Schmidt and Dr. Hess in October 2006 and again by Dr. Boessenecker in February 2007.  See AR 44 (Oct. 17, 2006 letter), AR 53 (Oct. 30, 2006 letter), AR 49 (Oct. 23, 2006 CRMC); AR 224 (Feb. 2, 2007 letter).

Defendant argues that, because Mr. Watson's doctors did not consistently diagnose him with either optic atrophy or optic neuritis, "the ABCMR reasonably concluded that Mr. Watson was not conclusively diagnosed with any medical issue or disorder that required referral to an MEB . . . during his active duty service."  Def.'s Mot. 24; cf. Def.'s Resp. 17 (claiming that Mr. Watson's doctors could not come to a "definitive consensus that Mr. Watson was suffering from optic neuritis").  Plaintiff counters that defendant's argument is "an impermissible post hoc rationalization of counsel."  Pl.'s Resp. 14; see id. at 13-14 ("While the ABCMR simply denied the existence of any disqualifying medical condition, Defendant attempts to narrow the Board's denial by arguing that the 'doctors were unable to reach a conclusive diagnosis as to the basis of Mr. Watson's eye troubles.'" (quoting Def.'s Mot. 15) (internal citation omitted)).  The court agrees.  Cf. Verbeck, 97 Fed. Cl. at 460 n.25 (characterizing as "improper post hoc justification[s]" certain government arguments aimed at "substantiat[ing] the Board's conclusions" that were "submitted for the first time in response to [the plaintiff's] petition for judicial review" (some alterations in original) (internal quotation marks omitted).  Moreover, while it is certainly true that Mr. Watson's physicians appeared perplexed by Mr. Watson's condition and struggled with his diagnosis, cf. Def.'s Mot. 23 (claiming that Dr. Boessenecker was "clearly . . . perplexed by Mr. Watson's condition"), plaintiff has established by clearly convincing evidence that Dr. Boessenecker, Dr. Schmidt and Dr. Hess diagnosed Mr. Watson with optic neuritis, a condition that obligated the Army to refer Mr. Watson to an MEB, see Army Reg. 40-501 ¶ 3-30(e) (providing that "optic neuritis" is a cause for referral to an MEB); id. ¶ 3-4 (providing that "[p]hysicians are responsible for referring soldiers with conditions listed [in chapter 3] to an MEB"); id. ¶ 3-3 ("Soldiers with conditions listed in this chapter who do not meet the required medical standards will be evaluated by MEB . . . .").  id. ¶ 3-3(d) ("Physicians who identify soldiers with medical conditions listed in [chapter 3] should initiate an MEB at the time of identification.").[18]

_____

[18]  Although Dr. Hess was a physician at an Army medical treatment facility, both Dr. Boessenecker and Dr. Schmidt appear to have been civilian physicians at the Amberg hospital.  See supra Part I.B (discussing Mr. Watson's visits with Dr. Hess, Dr. Boessenecker and Dr. Schmidt); see also Compl. ¶ 71 (indicating that Mr. Watson's October 17, 2006 visit was with a "[c]ivilian physician[]").  The court understands, however, that records from Mr. Watson's visits with Dr. Boessenecker and Dr. Schmidt were part of Mr. Watson's medical records at the Vilseck Army health clinic.  See Index to the AR (identifying these records as part of an "excerpt from plaintiff's medical records" (capitalization omitted)); see also AR 44 (Oct. 17, 2006 letter) (listing "Health-Klinik US-Army [redacted]" as the addressee and stating that the letter concerned "your patient Richard Watson"); AR 224 (Feb. 5, 2007 letter) (listing "Health-Klinik

Given the foregoing, the court concludes that the Board's finding that Mr. Watson "was never diagnosed with any medical issue/disorder that required referral to an MEB/PEB during his active duty service," AR 19 (ABCMR record), is unsupported by substantial evidence, cf. supra Part III.B.2.a (reaching the same conclusion as a result of Mr. Watson's diagnosis of atrophy of the optic nerve). Accordingly, insofar as plaintiff judgment on the administrative record as to this issue, plaintiff's Motion is GRANTED.

    c.    Harmless Error

Defendant argues that, even if Mr. Watson had been referred to an MEB, "[t]he record does not establish that Mr. Watson would have been found unfit." Def.'s Mot. 20; see also id. at 21 ("[I]t is reasonable to assume that an MEB would not have found Mr. Watson unfit for duty."). As the Board correctly observed, see AR 18 (ABCMR record), "[t]he mere presence[] of an impairment does not, of itself, justify a finding of unfitness because of physical disability," Army Reg. 635-40 ¶ 3-1; see also id. ¶ 3-1(a) ("The fact that the Soldier has one or more defects sufficient to require referral for evaluation . . . does not justify a decision of physical unfitness."). However, the "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province." Heisig, 719 F.2d at 1156; see Lewis v. United States, 458 F.3d 1372, 1377 (2006) ("[T]he questions of the fitness of an officer to serve on active duty, and in what capacity the officer should serve, are not for the courts to decide."); cf. Pl.'s Resp. 12 ("Mr. Watson did not ask the ABCMR to declare him unfit for duty, and he does not ask the Court to do so.").

Fitness for duty determinations are the exclusive "prerogatives of PEBs." Army Reg. 40-400 ¶ 7-1; see Army Reg. 635-40 ¶ 4-19(a)(1) (stating that one of the roles of the PEB is to determine "[w]hether the Soldier is physically fit or unfit to perform the duties of the Soldier's office, grade, rank, or rating"); Army Reg. 40-501 ¶ 3-4 ("The PEB will make the determination of fitness or unfitness."). A soldier is referred to a PEB upon a determination by an MEB that "the Soldier does not meet retention standards." Army Reg. 635-40 ¶ 4-10; cf. id. (stating that MEBs "are convened to document a Soldier's medical status and duty limitations insofar as duty is affected by the Soldier's status"); Army Reg. 40-400 ¶ 7-1 (similar). The court has determined that the Army failed to refer Mr. Watson to an MEB in accordance with its regulations, see supra Part III.B.2(a)-(b), and the court further finds that remanding this case to the Army for referral to an MEB is an appropriate remedy for this error, cf. Compl. ¶ 92(d) (requesting referral to an MEB for disability evaluation processing); 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."); RCFC 52.2(a) ("In any case within its jurisdiction, the court, on motion or on

---

US-Army 92249 Vilseck" as the addressee and stating that the letter concerned "your patient Richard Watson").

its own, may order the remand of appropriate matters to an administrate or executive body or official."); Lechliter v. United States, 72 Fed. Cl. 17, 20 (2006) (remanding to the secretary of the Army to refer the plaintiff to a formal PEB); Santiago v. United States, 71 Fed. Cl. 220, 230 (2006) (remanding to the secretary of the Army to evaluate the plaintiff's disability rating).  If an MEB determines that Mr. Watson did not meet medical retention standards in the fall of 2006 or early 2007, the MEB shall refer Mr. Watson to a PEB, which is solely responsible for determining whether Mr. Watson was fit for duty.

3.   The Court Finds It Premature to Address Whether the Board's Determination that the Army Did Not Err in Finding Mr. Watson Medically Fit for Deployment Was Arbitrary, Capricious, Unsupported by Substantial Evidence, or Contrary to Law

Plaintiff argued before the Board that, because the Army failed in its obligation to refer Mr. Watson to an MEB, see supra Part III.B.2, his deployment and the Army's order for redeployment were unlawful "because [they] directly conflicted with" Army Regulation 40-401 ¶¶ 3-3 and 5-14, see AR 31-32 (Mem. in Supp. of Appl. of Richard P. Watson (Pl.'s ABCMR Mem.)); cf. Army Reg. 40-501 ¶ 3-3 ("Soldiers with conditions listed in this chapter who do not meet the required medical standards will be evaluated by an MEB . . . ."); id. ¶ 5-14(c) ("Active duty soldiers who do not meet retention standards in chapter 3 of this regulation must be referred to an MEB/PEB for a fitness-for-duty determination.").  More specifically, plaintiff argued that "Mr. Watson was medically non-deployable" and that his refusal to deploy was therefore justified.  AR 32 (Pl.'s ABCMR Mem.); accord Pl.'s Mot. 33 (arguing that Mr. Watson's "diagnoses of Optic Nerve Atrophy and Optic Neuritis rendered him non-deploy[able] under Army Regulation 40-50[1] [¶] 5-14c"); Pl.'s Suppl. Br. 17 (arguing that, because Mr. Watson "was medically disqualified from deployment, his orders to deploy for a second and third time were unlawful").  Plaintiff further argued that, had Mr. Watson been referred to an MEB, he ultimately would have been diagnosed with multiple sclerosis, "which carries a minimum disability rating of 30%" and that he "should have been medically retired."  AR 31 (Pl.'s ABCMR Mem.); accord Compl. ¶¶ 73-74; cf. Army Reg. 635-40 ¶ 4-19(i) (providing that, once a PEB determines "that a Soldier is unfit because of physical disability, and that the Soldier is entitled to benefits, the PEB must decide the percentage rating for each unfitting compensable disability").

The Board considered plaintiff's arguments and concluded that, because Mr. Watson was not "diagnosed with or treated for any medical issues/disorders that prevent[ed] him from performing his military duties and might have required his referral to an MEB/PEB," Mr. Watson was "properly deployed with his unit to Iraq in August 2007" and was properly ordered to redeploy in December 2007.  See AR 20 (ABCMR record).  Because the court finds that the Board erred in concluding that Mr. Watson was not diagnosed with any conditions that required the Army to refer him to an MEB, see supra Part III.B.2, the Board's conclusion on this issue was based on a flawed premise.

In Part III.2 above, the court found that referral to an MEB was an appropriate remedy for the Army's failure to refer Mr. Watson to an MEB after he was diagnosed with both optic atrophy and optic neuritis.  Although the court agrees with defendant that these diagnoses did not "render[] [Mr. Watson] non-deployable per se," see Def.'s Suppl. Br. 5; see id. at 6 ("Had Mr. Watson been diagnosed with Optic Nerve Atrophy or Optic Neuritis in October 2006, he would have been referred to a [MEB], not automatically disqualified from deployment."), the precise process for determining whether an active duty soldier meets medical fitness standards for deployment is not clear to the court, cf. Army Reg. 40-501, ¶ 5-14 (discussing "[m]edical fitness standards for deployment" (emphasis omitted)).  It appears, however, that referral to either a PEB or a Military Occupational Specialty Medical Retention Board (MMRB)[19] is necessary.  See id. ¶ 5-14(c) (addressing different factors that must be considered when determining whether a soldier is deployable, which vary depending on whether the soldier has a temporary or permanent medical condition); cf. Army Reg. 614-30 ¶ 3-8b(1) (providing that "[s]oldiers with a permanent physical profile of '3' or '4' are nondeployable until completion of MMRB and/or PEB"); AR 13 (ABCMR record) (noting that Mr. Watson was assigned a temporary physical profile of three).  In any event, the court finds it premature to address whether the Army's deployment orders were unlawful.  Cf. supra Part III.B.2.c (stating that if an MEB determines that Mr. Watson did not meet medical retention standards in the fall of 2006 or early 2007, the MEB should refer Mr. Watson to a PEB).  Upon remand, the appropriate governing body should assess whether Mr. Watson was medically qualified for deployment in August of 2007 and December of 2007, and whether the Army's deployment orders were lawful.

The Board also determined that "the reason for [Mr. Watson's] separation (misconduct) was not related to any medical conditions that he may have been diagnosed with."[20]  AR 20 (ABCMR record).  Instead, the Board concluded that Mr. Watson simply

---

[19]  A Military Occupational Specialty Medical Retention Board (MMRB) is an "administrative screening board" that is charged with evaluating whether a soldier who has been assigned a permanent physical profile of three or four has the "physical ability to perform [the designated] duties in a worldwide field or austere environment."  Army Reg. 600-60 ¶ 2-1; see id. ¶ 2-1(d)(4) (stating that an MMRB may recommend referring a soldier to an "[]MEB/PEB[] or medical disqualification, as appropriate").

[20]  The Board further concluded that the general court-martial convening authority did not err in failing to initiate disability evaluation processing and that, even if it had, "this error would have been harmless because [Mr. Watson] presented no compelling evidence that circumstances warranted disability processing over administrative separation."  AR 20 (ABCMR record).  The Board appears to be referencing Army Regulation 635-40 ¶ 4-3, which provides that "an enlisted Soldier may not be referred for, or continue, physical disability evaluation processing when action has been started under any regulatory provision which authorizes a characterization of service of under other than honorable conditions."  Army Reg. 635-40 ¶ 4-3(a); cf. AR 18

did not want to return to Iraq.  Id. at 21; accord Def.'s Mot. 26 (claiming that "Mr. Watson knew he was deployable and knew the orders to deploy were lawful," as evidenced by his guilty plea before the summary court-martial, and that "Mr. Watson simply did not want to go").  As support for its conclusion, the Board pointed to the following evidence:  that Mr. Watson had "told another Soldier that he would seek asylum rather than redeploy, [that he] refused to get up for transport to the airport for redeployment, and [that] he told personnel" that he would go to the British embassy if he was forced to return to Iraq.  AR 20-21 (ABCMR record).  The Board also found persuasive the fact that Mr. Watson did not seek a deployment-related evaluation until after he refused to redeploy, see id. at 21; cf. AR 62 (Dec. 26, 2007 CRMC) (noting that, on December 26, 2007, Mr. Watson visited a primary care clinic in Vilseck to be evaluated for deployment), and that there was no evidence supporting Mr. Watson's contention that he told his commander that he was too sick to redeploy, see AR 20 (ABCMR record).

It is not clear to the court whether Mr. Watson's diagnoses of atrophy of the optic nerve and optic neuritis were significant contributing factors to his refusal to deploy or his subsequent involuntary discharge.  See, e.g., AR 93 (court martial leniency request) (stating that Mr. Watson was "plagued by a myriad of physical and mental ailments" which helped to "clarify why he [refused to deploy]" and further noting that "[o]ne of the reasons why [Mr.] Watson felt he could not return to Iraq was because of the current situation in his personal life," which included "credible evidence that his wife was cheating on him"); AR 64 (Dec. 26, 2007 CRMC) (noting that Mr. Watson did not "want to be sent back to Iraq" and that he requested "mental health help and an appointment with a Neurologist").  However, the court does not consider this issue material to the resolution of the case.  Plaintiff's claims are not premised on the argument that Mr.

---

(ABCMR record) (addressing Army Regulation 635-40 ¶ 4-3).  Army Regulation 635-40 ¶ 4-3 further provides that "the commander exercising general court-martial jurisdiction over the Soldier may abate the administrative separation" if the general court-martial convening authority determines that the "[t]he disability is the cause, or a substantial contributing cause, of the misconduct that might result in a discharge under other than honorable conditions," or "[o]ther circumstances warrant disability processing instead of alternate administrative separation."  Id. ¶ 4-3(b).

The court does not consider Army Regulation 635-40 ¶ 4-3 to be relevant to the facts of this case.  The court has found that Mr. Watson should have been referred for disability evaluation processing in or around October of 2006, see supra Part III.B.2; cf. Army Reg. 40-501 ¶ 3-3(d) (stating that "[p]hysicians who identify soldiers with medical conditions listed in [chapter 3] should initiate an MEB at the time of identification"), nearly two years before the Army began processing Mr. Watson's administrative separation, see AR 137 (separation action mem.) (indicating that the Army began processing Mr. Watson's administrative separation in June of 2008); cf. AR 16 (ABCMR record) (noting that Mr. Watson was discharged under other than honorable conditions in July of 2008).

Watson's medical conditions were a contributing cause to his refusal to deploy. Rather, plaintiff argues that, because the Army failed to refer Mr. Watson to an MEB, the Army's redeployment orders were unlawful and that, therefore, his refusal to deploy was justified. And, according to plaintiff, because Mr. Watson's refusal to deploy was justified, missing movement by design should not have been a basis for Mr. Watson's involuntary discharge.

Defendant next argues that, even if Mr. Watson's refusal to deploy was justified, the Army may still have discharged Mr. Watson for the wrongful disposition of his weapon and disobeying officers on several occasions. Def.'s Mot. 25; cf. AR 137 (separation action mem.) (stating that missing movement by design was one of three reasons why Mr. Watson was being recommended for involuntary discharge); AR 21 (ABCMR record) (citing the three reasons behind Mr. Watson's administrative separation action as evidence that "he could not or would not meet acceptable standards required of enlisted personnel"). Although the court considers it unlikely that the Army would have involuntarily discharged Mr. Watson had missing movement by design not been a factor, the court considers this to be a determination for the Army make. Therefore, if upon remand, the Army concludes that its redeployment orders were unlawful and that Mr. Watson's refusal to deploy was therefore justified, the Army shall determine whether Mr. Watson's involuntary discharge should be voided.

Finally, with respect to plaintiff's claim that the VA "opined that Mr. Watson was correct in refusing deployment because of his ongoing neurological deficits," Pl.'s Mot. 2, as the Board correctly observed, a decision by the VA "does not establish error on the part of the Army," AR 21 (ABCMR record). "Operating under different laws and its own policies, the VA does not have the authority or the responsibility for determining the characterization of a Soldier's active duty service." AR 21 (ABCMR record); cf. DeBatto v. United States, 87 Fed. Cl. 172, 178 (2009) (observing that "it is well established" that the Army is not bound by VA disability rating determinations), aff'd per curiam, 393 Fed. App'x. 722 (Fed. Cir. 2010); Haskins, 51 Fed. Cl. at 826 (explaining that the Army makes disability rating determinations when evaluating a soldier's "fitness for performing the duties of office, grade, and rank" whereas the VA makes disability rating determinations when evaluating an "individual's capacity to function and perform tasks in the civilian world").

Because the court finds it premature to address whether the Army's 2007 deployment and December 2007 order to redeploy were unlawful, these portions of parties' cross-motions are DENIED.[21]

---

[21] Accordingly, the court also finds it premature to address whether Mr. Watson is entitled to reinstatement, back pay or allowances. Cf. Def.'s Resp. 19 (arguing that Mr. Watson is not entitled to these remedies because he "was not ready, willing and able to serve"); Graves v. United States, 176 Ct. Cl. 68, 76 (1966) ("It has long been the rule in this court that back pay for

IV.     Conclusion

For the foregoing reasons, plaintiff's Motion is GRANTED-IN-PART and DENIED-IN-PART, and defendant's Motion is DENIED.  Pursuant to its authority under 28 U.S.C. § 1491(a)(2), the court remands this case to the secretary of the Army for referral of Mr. Watson to an MEB.  See supra Part III.B.2.

If the MEB determines that Mr. Watson did not meet medical retention standards in the fall of 2006 or early 2007, the MEB shall refer Mr. Watson to a PEB.  See supra Part III.B.2.  If the Army regulations and the findings of the MEB/PEB so require, the secretary of the Army shall direct the appropriate governing body to determine whether Mr. Watson's discharge should be voided on the basis that Mr. Watson was entitled to disability separation or disability retirement before he was involuntarily discharged.  Cf. supra Part III.A.3 (addressing plaintiff's argument that Mr. Watson "should have been medically retired" prior to his involuntary discharge).

If the Army regulations and the findings of the MEB/PEB also so require, the secretary of the Army shall direct the appropriate governing body to assess whether Mr. Watson was medically qualified for deployment in August of 2007 and December of 2007.  See supra Part III.B.3.  If it is determined that Mr. Watson was not medically qualified for deployment, the secretary of the Army shall also direct the appropriate governing body to determine whether the Army's deployment orders were unlawful, whether Mr. Watson's refusal to deploy was legally justified and whether Mr. Watson's discharge should be voided on this basis.  See supra Part III.B.3.

If it is determined that Mr. Watson was improperly discharged, the secretary of the Army shall void his discharge and assess the appropriate award of back pay and allowances under the Military Pay Act, 37 U.S.C. § 204.  Cf. supra Part III.A.1 (discussing plaintiff's claims under the Military Pay Act); supra Part III.A.2 (citing Dodson, 988 F.2d at 1208 for the proposition that "an enlisted serviceman who has been improperly discharged is entitled to recover pay and allowances only to the date on which his term of enlistment would otherwise have expired"); supra note 21 (finding it premature to address whether Mr. Watson is entitled to reinstatement, back pay or allowances).  Finally, to the extent applicable, the secretary of the Army shall determine whether Mr. Watson is eligible for disability retirement pay under 10 U.S.C. § 1201 or disability severance pay under 10 U.S.C. § 1203 and calculate the amount of such pay to which Mr. Watson is entitled.  Cf. supra Part III.A.1 (discussing plaintiff's claims under 10 U.S.C. § 1201 and addressing 10 U.S.C. § 1203); Pl.'s Resp. 8 (confirming that Mr.

---

improper dismissal will be denied where the employee is not ready, willing and able to resume his position during the period for which relief is sought.").

Watson "seek[s] medical retirement and disability benefits" pursuant to 10 U.S.C. § 1201 but that his "requested remedy . . . respects the fact that this Court is not in [the] position to make a disability determination").

This case shall be stayed pending remand.  <u>See</u> RCFC 52.2(b)(1)(C).  The remand shall last no longer than six months, <u>see</u> RCFC 52.2(b)(1)(B), and the parties shall file joint status reports every ninety days informing the court of the status of the remand, <u>see</u> RCFC 52.2(b)(1)(D).  "The results of the proceedings on remand are subject to this court's review," <u>Santiago</u>, 71 Fed. Cl. at 230 n.17.

IT IS SO ORDERED.

<u>s/ Patricia E. Campbell-Smith</u>
PATRICIA E. CAMPBELL-SMITH
Chief Judge