# In the United States Court of Federal Claims

No. 12-785C

(E-Filed:  August 20, 2014)[1]

_____

|  |  |  |
|---|---|---|
| | ) | |
| RICHARD P. WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | Remand to Administrative Body; |
| | ) | 28 U.S.C. § 1491(a)(2); RCFC |
| v. | ) | 52.2(a); Clarification of Issued |
| | ) | Remand Order |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

_____ )

Raymond J. Toney, Emeryville, CA, for plaintiff.

Sarah M. Valenti, Trial Attorney, with whom were Stuart F. Delery, Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Reginald T. Blades, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

ORDER and OPINION

CAMPBELL-SMITH, Chief Judge

This is a military disability case.  Richard P. Watson (plaintiff or Mr. Watson), a United States Army veteran, seeks clarification of this court's November 2013 decision in Watson v. United States, 113 Fed. Cl. 615 (2013); an order vacating the March 2014 decision of the Medical Evaluation Board (MEB);[2] and an order directing re-

_____

[1]   This Order and Opinion was originally filed under seal on August 13, 2014.  See ECF No. 41.  The court requested the parties to file a motion by Tuesday, August 19, 2014, if either party believed that the Order and Opinion should be redacted before publication.  See id. at 1 n.1.  Having not received a motion by either party, the Order and Opinion is published in its entirety.

[2]   Plaintiff's Motion references the March 2013 decision of the Medical Evaluation Board (MEB), Pl.'s Mot., ECF No. 33, at 1; however, the court understands plaintiff's

consideration of this matter by an MEB at a new Army facility.  See Pl.'s Mot., ECF No. 33, at 1.

Currently before the court are the Complaint, ECF No. 1, filed November 16, 2012; plaintiff's Motion, attached to which is plaintiff's Appendix[3] (Pl.'s App.), ECF No. 33-1, filed March 31, 2014; defendant's Response, ECF No. 38, attached to which is defendant's Appendix (Def. App.), ECF No. 38-1, filed respectively on April 28, 2014 and May 7, 2014; and plaintiff's Reply, ECF No. 39, filed May 8, 2014.

I.      Background

A.      Facts and Procedural History

The facts and procedural history of this case are set forth in detail in the court's November 2013 decision.  See Watson, 113 Fed. Cl. at 618–26.  For ease of reference, the court provides an abbreviated version of the relevant background here.

Mr. Watson enlisted in the Army on September 9, 2004 and served until July 11, 2008.  Compl. ¶¶ 10–11.  During his service, Mr. Watson served two tours of duty in Iraq:  from May through September 2005 and from August through December 2007.  Id. ¶ 13.  The Army ordered Mr. Watson to return to Iraq for a third tour of duty in December 2007, see id. ¶ 45, but Mr. Watson refused to deploy, id. ¶ 47.  As a result, the Army charged and convicted Mr. Watson under the Uniform Code of Military Justice, and involuntarily discharged him under other than honorable conditions.  Id. ¶¶ 52–55.

Mr. Watson claims that the Army's August 2007 deployment order to Iraq and its December 2007 order to redeploy were unlawful because he was not medically fit for deployment.  Specifically, he alleges that, in October 2006, he was diagnosed with optic nerve atrophy and optic neuritis, conditions that obligated the Army to refer him to an MEB pursuant to the Army Physical Disability Evaluation System.  See id. ¶¶ 70–72, 79; cf. id. ¶ 17 (claiming that his symptoms were "the first manifestation of Multiple Sclerosis ('MS'), from which Mr. Watson continues to suffer").  Notwithstanding its alleged obligation to do so, the Army did not refer Mr. Watson to an MEB.  Id. ¶¶ 79–80.  According to plaintiff, his August 2007 deployment to Iraq was therefore not lawful, id. ¶ 80, as was the Army's December 2007 order redeploying him to Iraq, see id. ¶¶ 85, 88.  Plaintiff contends that, because the Army's redeployment order was not lawful, his

_____

request as an order vacating the March 2014 MEB decision, which is included in plaintiff's Appendix, ECF No. 33-1.

[3]      When citing to plaintiff's Appendix the court refers to the page numbers assigned by plaintiff, which appear at the bottom of each page.

refusal to deploy was justified, see id. ¶¶ 89–90, and his subsequent involuntary
discharge for misconduct was not lawful, see id. ¶¶ 55, 90.

In March 2012, Mr. Watson applied to the Army Board for Correction of Military
Records (the Board) for correction of his military records. Id. ¶ 7. Mr. Watson requested
that the Board void his involuntary discharge; that he receive reinstatement to active duty,
effective July 12, 2008, with back pay and allowances; that he receive restoration of his
grade; and that he receive a referral to an MEB for disability evaluation processing. Id. ¶
61. On October 18, 2012 the Board denied the relief requested by Mr. Watson. See id. ¶
62. On November 16, 2012, plaintiff filed a complaint in this court, arguing that the
Board's findings were "arbitrary, capricious, unsupported by substantial evidence and
contrary to law." See id. ¶¶ 75, 81, 91.

B.      The Court's November 2013 Decision

On November 21, 2013, the court ruled that the Board's determination,
specifically that Mr. Watson was never diagnosed with any medical conditions that
required referral to an MEB, was unsupported by substantial evidence. Watson, 113 Fed.
Cl. at 638. The court concluded that Mr. Watson's diagnosis of atrophy of the optic
nerve as well as optic neuritis obligated his diagnosing physicians to refer him to an
MEB. See Watson, 113 Fed. Cl. at 634–38. The court remanded the case to the
Secretary of the Army for the referral of plaintiff to an MEB. Id. at 639, 642. The court
stated that "[i]f an MEB determines that Mr. Watson did not meet medical retention
standards in the fall of 2006 or early 2007, the MEB shall refer Mr. Watson to a [Physical
Evaluation Board (PEB)], which is solely responsible for determining whether Mr.
Watson was fit for duty." Id. at 639; see also id. at 642 (similar).

C.      The March 2014 MEB Decision

Pursuant to the court's remand order, in January 2014, the Army initiated an MEB
review of Mr. Watson's case in Fort Gordon, Georgia. See Pl.'s Mot. 2; Def.'s Resp. 2.
Among the records considered by the MEB in reaching its decision were the court's
November 2013 decision, the Board's October 2012 decision, and 2009 and 2013
Veterans Administration (VA) rating decisions. Pl.'s App. 3 (Narrative Summary
(NARSUM)). Rather than limiting its consideration to whether Mr. Watson's diagnoses
of atrophy of the optic nerve and optic neuritis met medical retention standards in the fall
of 2006 or early 2007, see Watson, 113 Fed. Cl. at 639, the MEB appears to have
considered whether Mr. Watson had any condition that failed to meet retention standards
during the entire course of his active duty service, see Pl.'s App. 3–6 (NARSUM). The
MEB did identify several medical conditions—including optic neuritis—that potentially
affected Mr. Watson's duty status. Id. at 4–6. However, on March 11, 2014, the MEB
found that Mr. Watson met medical retention standards for each of the identified
conditions and that he therefore would not be referred to a PEB for further processing.

3

See id. at 1 (DA Form 3947, MEB Proceedings (MEB)).  On March 12, 2014, the approving authority approved the findings and recommendations of the MEB.  Id. at 2.

### D.   Plaintiff's Motion

Plaintiff argues that the MEB violated the court's remand order by considering records dated after "early 2007."  Pl.'s Mot. 3.  Plaintiff asks the court to clarify its order requiring the MEB to determine whether Mr. Watson met medical retention standards "in the fall of 2006 or early 2007."  Id.; cf. Watson, 113 Fed. Cl. at 639, 642.  Plaintiff also contends that "[t]he MEB's consideration of the decisions of the [Board] and this Court effectively 'politicized' what should have been a strictly medical determination," and asks that the court vacate the March 2014 MEB decision.  Pl.'s Mot. 3–4.  Plaintiff further requests that his case be reconsidered by an MEB at a different Army facility, given the "fundamentally unfair manner in which the Fort Gordon MEB handled [this] matter."  Id. at 4.

Defendant counters that plaintiff's requests are "premature because the approving authority has not yet finalized the MEB."  Def.'s Mot. 3.  Defendant argues, in the alternative, that the MEB's failure to limit its review to records dated prior to early 2007 "fully comports with the Court's order and applicable regulations."  Id. at 5.

For the reasons stated below, plaintiff's Motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## II.   Legal Standards

Pursuant to the Tucker Act, this court has the authority "to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."  28 U.S.C. § 1491(a)(2) (2012); see also RCFC 52.2(a) ("In any case within its jurisdiction, the court, on motion or on its own, may order the remand of appropriate matters to an administrate or executive body or official."); see, e.g., Stuart v. United States, 108 Fed. Cl. 458, 472–73 (2013) (remanding to the Board to determine whether the plaintiff should have been referred to an MEB); Lechliter v. United States, 72 Fed. Cl. 17, 20 (2006) (remanding to the Secretary of the Army to refer the plaintiff to a PEB); Santiago v. United States, 71 Fed. Cl. 220, 230 (2006) (remanding to the Secretary of the Army to evaluate the plaintiff's disability rating).   "The results of the proceedings on remand are subject to this court's review."  Santiago, 71 Fed. Cl. at 230 n.17.

## III.   Discussion

4

A.      Propriety of Judicial Review

Defendant argues that plaintiff's request for relief is premature because Mr.
Watson failed to avail himself of the MEB appeal procedure.  Def.'s Resp. 3; cf. Pl.'s
App. 2 (MEB) (affording the patient the opportunity to appeal the MEB's findings and
recommendation).   Defendant urges the court "not [to] make any determinations as to the
MEB's propriety until the agency has had a fair opportunity to consider the matters that
Mr. Watson raises here in the first instance."  Def.'s Resp. 4.  In defendant's view,
"[f]airness and judicial efficiency weigh in favor of permitting the Army to address,
through the proscribed regulatory process, any alleged deficiencies that Mr. Watson seeks
to raise here."  Id.; cf. Army Reg. 40-400 ¶ 7-13.

Plaintiff counters, and the court agrees, that fairness and judicial economy are
better served by having the court clarify its intended scope of the November 2013
Decision.  See Pl.'s Reply 5.  The court hopes that by addressing and clarifying the
court's 2013 November decision now, the need for judicial intervention in the future will
be averted.  In the future, however, plaintiff shall exhaust all administrative remedies
prior to seeking review in this court.

B.      Clarification of the Court's November 2013 Decision

In its November 2013 decision, the court ordered the MEB to determine whether
Mr. Watson met "medical retention standards in the fall of 2006 or early 2007," and, if
so, to "refer Mr. Watson to a PEB."  Watson, 113 Fed. Cl. at 639; see also id. at 642.

Plaintiff contends that "[i]n establishing 'the fall of 2006 . . . ,' the [c]ourt appears
to have intended [that] the Army . . . consider Mr. Watson's condition as of October 31,
2006, when the Army assigned Mr. Watson a duty limiting physical profile."  Pl.'s Mot. 3
(internal citations omitted).  Plaintiff is incorrect as to the court's intention.  The court
identified the fall of 2006 as a parameter because Dr. Jinjong Chung (Dr. Chung), the
chief of optometry at the Vilseck optometry clinic, diagnosed Mr. Watson with optic
atrophy four times in the fall of 2006.  Watson, 113 Fed. Cl. at 636 (noting that Mr.
Watson was diagnosed with optic atrophy on October 13, 2006; October 16, 2006;
October 18, 2006; and November 22, 2006).  And, pursuant to chapter 3 of Army
Regulation 40-501, Dr. Chung was obligated to refer Mr. Watson to an MEB on each of
these occasions.  Id. (citing Army Reg. 40-501 ¶ 3-15(c) (providing that "[a]trophy of the
optic nerve due to disease" is cause for referral to an MEB); id. ¶ 3-4 (providing that
"[p]hysicians are responsible for referring [s]oldiers with conditions listed [in chapter 3]
to an MEB"); id. ¶ 3-3(d) ("Physicians who identify soldiers with medical conditions
listed in [chapter 3] should initiate an MEB at the time of identification.")).  Because the
last date on which Dr. Chung diagnosed Mr. Watson with optic atrophy was November
22, 2006, the court intended for the MEB to determine whether Mr. Watson's atrophy of
the optic nerve diagnosis met medical retention standards as of this date.

Plaintiff also contends that "[i]n establishing . . . [']early 2007,' the Court appears to have intended [that] the Army . . . consider Mr. Watson's condition as of . . . February 2, 2007, when Mr. Watson was again hospitalized and Dr. Boessenecker again gave the diagnosis of optic nerve neuritis."  Pl.'s Mot. 3 (internal citation omitted).  Here, plaintiff is correct as to the court's intention.  The court identified early 2007 as a parameter because the last date on which Mr. Watson was diagnosed with optic neuritis was February 2, 2007.  Watson, 113 Fed. Cl. at 637–38 (noting that Mr. Watson was diagnosed with optic neuritis on October 17, 2006; October 23, 2006; October 30, 2006; and February 2, 2007).  And, pursuant to chapter 3 of Army Regulation 40-501, the diagnosing physicians were obligated to refer Mr. Watson to an MEB on each of these occasions.  Id. at 638 (citing Army Reg. 40-501 ¶ 3-30(e) (providing that "optic neuritis" is a cause for referral to an MEB); id. ¶ 3-4 (providing that "[p]hysicians are responsible for referring [s]oldiers with conditions listed [in chapter 3] to an MEB"); id. ¶ 3-3(d) ("Physicians who identify [s]oldiers with medical conditions listed in [chapter 3] should initiate an MEB at the time of identification.")).  Because the last date on which Mr. Watson was diagnosed with optic neuritis was February 2, 2007, the court intended for the MEB to determine whether Mr. Watson's optic neuritis diagnosis met medical retention standards as of this date.

C.     The March 2014 MEB at Fort Gordon

The role of the MEB in the Army Physical Disability Evaluation System is to determine whether a soldier meets medical retention standards.  See Army Reg. 635-40 ¶ 4-10.  "MEBs are convened to document a Soldier's medical status and duty limitations insofar as duty is affected by the [Soldier's] medical status."  Army Reg. 40-400 ¶ 7-1; see also Army Reg. 635-40 ¶ 4-10 (similar).  "MEBs operate informally" and review "[c]linical, health, and other records, as appropriate."  Army Reg. 40-400 ¶ 7-7.  The decision as to whether the soldier meets medical fitness standards is made based on the criteria in chapter 3 of Army Regulation 40-501.  Id.

The court agrees with plaintiff that on remand, the inquiry of interest to the court is a limited one, specifically the MEB's review of the clinical, medical, and other records that existed on or before November 22, 2006 (with respect to Mr. Watson's optic atrophy diagnosis) and February 5, 2007 (with respect to Mr. Watson's optic neuritis diagnosis).[4] See Pl.'s Reply 2.  Accordingly, the MEB's consideration of 2009 and 2013 records in reaching its determination that plaintiff's optic neuritis diagnosis met medical retention standards exceeded the intended scope of the court's remand order.  Cf. Pl.'s App. 6

---

[4]     The medical record associated with Mr. Watson's February 2, 2007 optic neuritis diagnosis is dated February 5, 2007.  See Watson v. United States, 113 Fed. Cl. 615, 623, 637 (2013).

(NARSUM) (referencing the 2009 VA rating decision and October 2013 discharge summary in its analysis of Mr. Watson's optic neuritis diagnosis).[5]

Rather than undertake the circumscribed review directed by the court, the MEB examined whether Mr. Watson had any medical condition that failed to meet retention standards during the entire course of his active duty service.  See Pl.'s App. 4–6 (NARSUM) (identifying and examining eight conditions).  Plaintiff does not object to the MEB's identification and analysis of other medical conditions that potentially affected Mr. Watson's duty status.

But, plaintiff does take exception to the MEB's consideration of the Board's October 2012 decision and the court's November 2013 decision.  Plaintiff argues that by considering the same, the MEB was "improperly alerted . . . to the legal context in which [it] was ordered and . . . of the potential legal and financial consequences to the Army of a finding that Mr. Watson did not meet retention standards."  Pl.'s Reply 3; see also id. at 5 ("The potential prejudice to Mr. Watson of the MEB's knowledge and consideration of his refusal to deploy and resulting conviction by court-martial is self-evident.").

Defendant disagrees and calls into question the intent of plaintiff's instant challenge to the most recent determination by the MEB.  Defendant contends that plaintiff effectively "seeks to artificially impose blinders on the process that are not specified in the [c]ourt's [November 2013 decision]."  Def.'s Resp. 5.

The court does not view the MEB's consideration of the Board's October 2012 decision and the court's November 2013 decision as categorically improper.  The

---

[5]  Plaintiff contends that the MEB relied on the 2009 VA rating decision "to support its erroneous determination that he met retention standards, while ignoring the MS diagnosis contained in the same VA records."  Pl.'s Reply 4; see also Pl.'s Mot. 3 (arguing that "[t]he MEB's selective use of post-discharge medical records is also of particular concern given some [of] those records reflect the final diagnosis of Mr. Watson's neurological disorder as MS.").  According to plaintiff, this alleged selective consideration of records "points strongly in th[e] direction" of bad faith.  Pl.'s Reply 3.

Although plaintiff "stops short of arguing bad faith on the part of the Army," id. at 3, the court notes that government officials, including members of the military, are presumed to act in good faith, Dodson v. United States, 988 F.2d 1199, 1204 (Fed. Cir. 1993).  In order to overcome this presumption, "the proof must be almost irrefragable."  Galen Med. Assocs. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (internal quotation marks omitted).  "[T]he necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff."  Torncello v. United States, 681 F.2d 756, 770 (Ct. Cl. 1982).  Plaintiff's allegations do not approach the irrefragable proof necessary to find bad faith on the part of a government official.

regulations do not require the MEB to make medical retention determinations in a vacuum, and the MEB is presumed to have reviewed the court's November 2013 decision in an effort to abide by the court's remand order.  The court recognizes that "MEBs are authorized only to make medical determinations, not moral or legal ones," see Pl.'s Reply 5, and the court defers to the MEB's purely medical determination regarding whether Mr. Watson's diagnoses of optic atrophy and optic neuritis met medical retention standards. It is the court's expectation that on remand, the MEB made its determination (and would make again any necessary determination) without regard to the "potential legal and financial consequences to the Army of a finding that Mr. Watson did not meet retention standards."  See Pl.'s Reply 3; cf. Dodson v. United States, 988 F.2d 1199, 1204 (Fed. Cir. 1993) ("[M]ilitary administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs.").

In this opinion, the court considers only whether the MEB complied with the court's November 2013 remand order, which inquired of the MEB whether Mr. Watson's diagnoses of atrophy of the optic nerve and optic neuritis met medical retention standards as of November 22, 2006 and February 2, 2007, respectively.  See supra Part III.B. The court does not discern any administrative impropriety in the MEB's expanded scope of inquiry or the MEB's consideration of records dated subsequent to February 2007 in its identification and analysis of Mr. Watson's other medical conditions.  Cf. Pl.'s App. 3 (NARSUM) (stating that the 2013 VA rating decision was used to identify medical conditions that potentially affected Mr. Watson's duty status).  But, for the purpose of performing the review that it must in this case, the court has not been assisted by the enlarged scope of review conducted by the MEB.  To permit a proper review of plaintiff's claim, the court must vacate the portion of the MEB's decision that considered records that post-dated February 2007 in determining that plaintiff's optic neuritis diagnosis met medical retention standards.

To be clear, the court does not serve as a "super correction board."  Skinner v. United States, 594 F.2d 824, 830 (Ct. Cl. 1979).  Rather, it defers to the Army's decisions regarding medical retention standards and fitness for duty determinations.  Accordingly, the remainder of the MEB's decision shall stand.

D.      Remand to the Fort Gordon MEB

Plaintiff argues that "[b]ecause of the fundamentally unfair manner in which the Fort Gordon MEB handled Mr. Watson's matter, it is in the interest of justice that his case be considered anew by an MEB at a different Army installation."  Pl.'s Mot. 4. Plaintiff's argument is premised, however, on his assumption that the Fort Gordon MEB handled his case in a "fundamentally unfair manner," a supposition the court does not share.  See supra Part III.C.  Accordingly, the court remands this case to the Fort Gordon MEB for further processing in accordance with the specific orders set forth below in Part

IV.  Plaintiff's motion for an order directing MEB processing at a different Army facility is **DENIED**.

IV.    Conclusion

For the foregoing reasons, plaintiff's Motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.  Plaintiff's Motion is granted to the extent it requests the court to clarify its November 2013 decision and to vacate the portion of the MEB that addresses Mr. Watson's optic neuritis diagnosis.  Plaintiff's Motion is otherwise denied.  Pursuant to its authority under 28 U.S.C. § 1491(a)(2), the court remands this case to the Fort Gordon MEB.

Consistent with the Army Regulations, on remand the Fort Gordon MEB shall evaluate whether Mr. Watson's optic atrophy <u>and</u> optic neuritis diagnoses met medical retention standards.  With respect to Mr. Watson's optic atrophy diagnosis, the MEB shall limit its review to clinical, health, and other records that existed on or before November 22, 2006, and, with respect to Mr. Watson's optic neuritis diagnosis, the MEB shall limit its review to clinical, health, and other records that existed on or before February 5, 2007.[6]  <u>See</u> <u>supra</u> Part III.C; <u>cf.</u> <u>supra</u> note 4 (observing that the medical record associated with Mr. Watson's February 2, 2007 optic neuritis diagnosis is dated February 5, 2007).  Although the MEB is permitted to refer to this decision and the court's November 2013 decision as guidance, <u>see</u> <u>supra</u> Part III.C, the MEB shall not weigh the legal and financial consequences of its medical determination in its decision-making process.  If the MEB determines that Mr. Watson's optic atrophy and optic neuritis diagnoses did not meet medical retention standards, the MEB shall refer Mr. Watson to a PEB.

As more fully set forth in the court's November 2013 decision, if the Army regulations and the findings of the MEB/PEB so require, the Secretary of the Army shall direct the appropriate governing body to determine whether Mr. Watson's discharge should be voided on the basis that Mr. Watson was entitled to disability separation or disability retirement before he was involuntarily discharged.  Also, if the Army regulations and the findings of the MEB/PEB so require, the Secretary of the Army shall

---

[6]    In the Complaint, plaintiff alleges that the Army should have referred Mr. Watson to an MEB "no later than October 13, 2006," when he was first diagnosed with optic nerve atrophy, and again on October 17, 2006, when he was first diagnosed with optic neuritis.  Compl. ¶¶ 70, 71.  The court agreed and further found that subsequent diagnoses of both conditions also mandated Mr. Watson's referral to an MEB.  <u>Watson</u>, 113 Fed. Cl. at 636–38; <u>see also</u> <u>supra</u> Part III.B.  In an effort to ensure that the MEB has sufficient records to determine whether either diagnosis met medical retention standards, the MEB is permitted to consider records dated on or before November 22, 2006 regarding Mr. Watson's optic nerve atrophy diagnosis and records dated on or before February 5, 2007 regarding Mr. Watson's optic neuritis diagnosis.

direct the appropriate governing body to assess whether Mr. Watson was medically qualified for deployment in August of 2007 and December of 2007.  If it is determined that Mr. Watson was not medically qualified for deployment, the Secretary of the Army shall direct the appropriate governing body to determine whether the Army's deployment orders were unlawful, whether Mr. Watson's refusal to deploy was legally justified and whether Mr. Watson's discharge should be voided on this basis.

If it is determined that Mr. Watson was improperly discharged, the Secretary of the Army shall void his discharge and assess the appropriate award of back pay and allowances under the Military Pay Act, 37 U.S.C. § 204.  Finally, to the extent applicable, the Secretary of the Army shall determine whether Mr. Watson is eligible for disability retirement pay under 10 U.S.C. § 1201 or disability severance pay under 10 U.S.C. § 1203 and calculate the amount of such pay to which Mr. Watson is entitled.

If plaintiff requests relief related to any of the processes or procedures set forth above, plaintiff must first exhaust all administrative remedies prior to seeking review in this court.  See supra Part III.A.

The stay of this case is continued pending remand.  See RCFC 52.2(b)(1)(C).  The remand shall last no longer than six months, see RCFC 52.2(b)(1)(B), and the parties shall file joint status reports every ninety days informing the court of the status of the remand, see RCFC 52.2(b)(1)(D).  "The results of the proceedings on remand are subject to this court's review."  Santiago, 71 Fed. Cl. at 230 n.17.

IT IS SO ORDERED.

s/ Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Chief Judge